## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KELLY DUDA,

       *Plaintiff*,

  v.

UNITED STATES DEPARTMENT
OF JUSTICE, *et al.*,

       *Defendants*.

Civil Action No. 24 - 1048 (LLA)

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Kelly Duda brings this action against the Department of Justice ("DOJ") and the Federal Bureau of Investigation ("FBI" or "Bureau") (collectively, "Defendants"), alleging several violations of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  Mr. Duda seeks the release of audio recordings related to the investigation of Emmett Till's murder.  The parties have now reached an impasse with respect to one of the many recordings at issue in this case: a taped interview of Roy Bryant ("Bryant Audio"), one of the men who confessed to killing Mr. Till. While Defendants continue to process other recordings related to Mr. Duda's FOIA request, the parties have submitted cross-motions for partial summary judgment with respect to the Bryant Audio.  For the reasons explained below, the court concludes that (1) *in camera* review is required to resolve the parties' arguments concerning Exemption 7(D), (2) Defendants' withholdings of the Bryant Audio under Exemptions 6 and 7(C) are improper, and (3) Defendants failed to reasonably segregate and produce non-exempt information in the Bryant Audio.  The court will therefore deny both parties' motions and conduct *in camera* review with respect to Exemption 7(D), but will deny Defendants' motion and grant Mr. Duda's motion with respect to the latter two claims.

# I.    FACTUAL BACKGROUND

## A.    The Murder of Emmett Till and Immediate Aftermath

The facts surrounding the tragic murder of Emmett Till are well known.  In the summer of 1955, Mr. Till, who was fourteen years old, was visiting family (the Wrights) in Money, Mississippi.  ECF No. 21-6, at 20-22.  On August 24, Mr. Till and a group of friends went to a local grocery store owned by Roy and Carolyn Bryant, a white married couple.  ECF No. 21-5, at 2; ECF No. 21-6, at 38, 40.[1]  Mr. Bryant was outside the state at the time, but Mrs. Bryant was tending to the store with a relative.  ECF No. 21-6, at 39-40.  According to Mrs. Bryant's testimony at the eventual murder trial, Mr. Till, who was Black, allegedly wolf-whistled at her.  ECF No. 21-5, at 2, 19; ECF No. 21-6, at 39.  Mr. Till and his companions left the store shortly thereafter.  ECF No. 21-6, at 40.

Several days later, in the early morning of August 27, Roy Bryant and his half-brother, J.W. Milam, kidnapped Mr. Till from his relatives' home.  ECF No. 21-6, at 12, 51.  The two men, along with several others, took Mr. Till to a barn belonging to Leslie Milam, J.W. Milam's brother.  ECF No. 21-6, at 6, 89-90.  There, they brutally beat, shot, and murdered Mr. Till.  ECF No. 21-5, at 2.  To dispose of his body, Mr. Bryant and Mr. Milam tied a seventy-pound cotton gin fan to Mr. Till's neck using barbed wire and submerged him in the Tallahatchie River.  ECF No. 21-6, at 133.  Mr. Till's body was not discovered for four days.  ECF No. 21-6, at 68.

Almost immediately after Mr. Till's disappearance, local authorities arrested Mr. Bryant and Mr. Milam after eyewitnesses reported suspicious activity by both men.  *Id.* at 67.  The two stood trial for murder in September 1955.  *Id.* at 81.  At the trial, Mrs. Bryant testified for the

---

[1] The citations in these documents refer to the ECF-generated page numbers at the top of each page, rather than any internal pagination.

defense "that Till had propositioned her and physically touched her hand, arm[,] and waist while they were both inside the store."  ECF No. 21-7, at 3.  After four days, both men were acquitted by an all-white, all-male jury.  ECF No. 21-5, at 2.  No further attempts to prosecute the crime ever took place, and no other suspects were ever charged.  *Id.*

Mr. Till was laid to rest in early September 1955.  His mother, Mamie Till Mobley, insisted on an open-casket funeral, which was attended by more than 50,000 people.  ECF No. 21-5, at 6.  Photographs of the funeral services, including Mr. Till's "mutilated corpse[,] horrified the nation and became a catalyst for the bourgeoning civil rights movement."  *Id* at 6-7.[2]

Having been acquitted of the crime, Mr. Bryant and Mr. Milam confessed to the murder only a few months later.  ECF No. 21-5, at 18-21.  Their accounts of the kidnapping and killing were subsequently published in the January 1956 edition of *Look* Magazine by William Bradford Huie.  *Id.*  While both men were involved in the kidnapping and murder, Mr. Milam confessed to shooting Mr. Till.  *Id.* at 21.  Mr. Huie also reproduced Mrs. Bryant's allegations that Mr. Till had "squeezed her hand," asked "about a date," and then grabbed her by the waist.  *Id.* at 19 (internal quotation marks omitted).  The article ended by stating that "[t]he majority—by no means *all*, but the *majority*—of the white people in Mississippi 1) either approve[d] of [Mr.] Milam's action or else 2) they d[idn]'t disapprove enough to risk giving their 'enemies' the satisfaction of a conviction."  *Id.* at 21.  Mr. Huie paid Mr. Milam, Mr. Bryant, and Mrs. Bryant a total of $3,150

---

[2] Mr. Till's murder took place against the backdrop of significant, racially charged violence in Mississippi.  In May 1955, Willie George Washington Lee, a Black minister and the first Black person to register to vote in Humphrey's County, Mississippi, was shot and killed.  ECF No. 21-6, at 16.  No one was arrested for or charged with the crime.  *Id.*  In August 1955, Lamar Smith, a World War II veteran and advocate for Black voting rights, was murdered on a courthouse lawn in Brookhaven, Mississippi.  *Id.* at 17.  Three white men were arrested, but a grand jury did not return any indictments.  *Id.*

for their interviews.  *Id.* at 23-33.  They also signed releases giving Mr. Huie the right to "to publish, produce, dramatize, adapt[,] or otherwise present" the story of Mr. Till's murder based on their statements.  *Id.* at 23.  Mr. Milam passed away in 1980, Mr. Bryant passed away in 1994, and Mrs. Bryant passed away in 2023.  ECF No. 21-6, at 24-25, 115.

### B.    The FBI's 2004 Investigation into Mr. Till's Murder

Almost half a century later, in 2004, and at the request of the Greenwood, Mississippi district attorney's office, the FBI launched a new investigation into Mr. Till's murder "in an effort to determine if other individuals were involved in the[] crimes and to bring forth state indictments against th[o]se individuals if . . . appropriate."  ECF No. 21-6, at 6.[3]  By then, most of the other witnesses and individuals with first-hand knowledge of the murder had died.  *See* ECF No. 21-6, at 20-31 (indicating that almost everyone with some connection to the murder and its aftermath was "deceased").  Only four known witnesses were still alive when the FBI opened its 2004 investigation: Mrs. Bryant; Willie Reed, who saw Mr. Till in the back of a truck at Leslie Milam's farm on the day he was kidnapped and provided critical testimony at the murder trial, ECF No. 21-6, at 138-40; Simeon Wright, Mr. Till's cousin who was with him the moment he was kidnapped, *id.* at 142-44; and Wheeler Parker, Jr., who was with Mr. Till at the Bryants' grocery store and at the Wrights' home the night of the kidnapping, *id.* at 146-54.[4]

---

[3] At the time of Mr. Till's murder, Congress had yet to pass any federal hate-crime statutes.  ECF No. 21-7, at 3.  The FBI's 2004 investigation was initiated, in part, to determine whether any individuals could be charged under such statutes.  *Id.*

[4] Mr. Reed passed away in 2013, ECF No. 21-6, at 138-40, and Mr. Wright passed away in 2017, *id.* at 142-44.  Mr. Parker is believed to be the last living witness of Mr. Till's final days.  *Id.* at 146-64.

The FBI published a redacted version of its investigative findings ("FBI Report") in February 2006. *See id.* at 5. In a section titled "Roy Bryant's Admission," the FBI reported that

> In 1985, an individual, who is now a cooperating witness, but who was unaffiliated with law enforcement at the time, hereinafter referred to as [REDACTED], met with Roy Bryant and approached him about [REDACTED]. [REDACTED] and Bryant rode together to the Wright home, Bryant's Meat Market and Grocery[,] and to the barn where Till had been beaten and killed. During the trip, [REDACTED] was equipped with an audio cassette recorder and successfully recorded portions of their conversation.

*Id.* at 90. When asked about the kidnapping of Mr. Till, Mr. Bryant said that they had planned to "put his ass in the river," that they had "done whopped the son of a bitch," and that "carryin' him to the hospital wouldn't have done him no good." *Id.* at 91. He also told the cooperating witness: "I'm the only one who's livin' that knows it . . . . That's all that will ever be known." *Id.*[5]

The witness who recorded this conversation is believed to be Luster Bayless, a Hollywood costume designer who had become interested in making a film about Mr. Till's murder. ECF No. 21-7, at 29; *see* ECF No. 21-3, at 3.[6]   In June 2005, Mr. Bayless contacted the FBI about turning over a recording he had in connection with "the Emmit Teal [sic] case." ECF No. 21-8 ¶ 18. He further explained that he had "t[aken] a ride with a gentleman by the name of Roy Brown [sic] and possesse[d] a tape of the conversation." *Id.* The FBI's Form FD-71 documenting his 2005 conversation with the FBI did not have the box for "Protect Source" checked. *Id.* The form also indicated that Mr. Bayless had given the recording to the National Archives and Records

---

[5] Writing for *The Atlantic* magazine, journalist Wright Thompson published an extensive article about Mr. Till's murder and hypothesized that this audio recording "is likely the only existing description of what happened inside the barn in the final hour of Till's life." ECF No. 21-7, at 29.

[6] The citations in these documents refer to the ECF-generated page numbers at the top of each page, rather than any internal pagination.

Administration. *See id.* Mr. Bayless eventually passed away in February 2022. ECF No. 21-3, at 3.[7]

At the end of its investigation, the FBI concluded that it could not pursue any potential federal charges due to the relevant statutes of limitations. ECF No. 21-5, at 2. But because additional state charges were still possible, *see* ECF No. 21-6, at 113, the FBI turned its evidence over to the Leflore County district attorney's office, *id.* at 156. The county empaneled a grand jury, but it did not return any indictments. *Id.* The FBI subsequently closed its investigation in December 2007. *Id.*

## C.    Mrs. Bryant's Alleged Recantation and the FBI's Reinvestigation

In 2017, historian Timothy Tyson published a book on Mr. Till's murder and claimed—based on an interview with Mrs. Bryant—that Mrs. Bryant had recanted her story about Mr. Till's "physical assault" at the grocery store in 1955. ECF No. 21-6, at 116 ("She said with respect to the physical assault on her, or anything menacing or sexual, that that part isn't true[.]"). Because Mrs. Bryant's testimony had played such a critical role in securing the acquittals of her husband and Mr. Milam, this revelation prompted the FBI to reopen its investigation into the case. ECF No. 21-7, at 2-3. The FBI interviewed Mrs. Bryant, who was still alive at the time, but she "denied to the FBI that she [had] ever recanted her testimony and provided no information beyond what was uncovered during the previous federal investigation." *Id.* at 4. The FBI concluded that there

---

[7] While the parties vigorously dispute the identity of the Bryant Audio witness, *see infra* Part IV.A, Dale Killinger—the FBI agent who led the Bureau's 2004 investigation into Mr. Till's murder—states that he "received [the Bryant Audio] recording on behalf of the FBI in 2005 and know[s] that the individual who provided this recording is now deceased." ECF No. 21-8, ¶ 6. Nothing in his declaration, however, "is intended to confirm or deny the identity of the individual who provided this recording." *Id.* ¶ 7.

was "insufficient evidence to prove that she ever told [Professor Tyson] that any part of her testimony was untrue." *Id.* It also "found no new evidence suggesting that either [Mrs. Bryant] or any other living person was involved in Till's abduction and murder." *Id.* The FBI officially closed its reinvestigation in December 2021. *Id.* at 2. Mrs. Bryant died a year-and-a-half later. ECF No. 21-6, at 115.

### D.    Mr. Duda's FOIA Request

Kelly Duda is a freelance journalist "currently exploring the circumstances surrounding the murder of Emmett Till in connection with a forthcoming journalistic project." ECF No. 21-3 ¶¶ 1-2. In March 2024, Mr. Duda submitted a FOIA request to the FBI for:

1.   All audio recordings made by Luster Bayless and provided to the FBI;

2.   The full audio recording(s) from which the FBI Report quotes portions on page 92 [(i.e., ECF No. 21-6, at 91)];

3.   All audio recordings of Roy Bryant;

4.   Any and all other audio recordings in the FBI's file concerning its investigations into Till's death.

ECF No. 17, at 3. Mr. Duda also asserted that, as "a representative of the news media, [he was] only required to pay for the direct cost of [the] duplication of records." ECF No. 17-2, at 3. He explained that "[t]his information is being sought in connection with the production of a journalistic project about Till, which will be available to the public." *Id.* Mr. Duda stated, however, that he was willing to "pay up to $100" for duplication costs. *Id.* Later that month, the FBI informed Mr. Duda that it had encountered "unusual circumstances" in processing his request and would need additional time. ECF No. 17-4, at 2-3 (quoting 5 U.S.C. § 552(a)(6)(B)(iii)).

## II.    PROCEDURAL HISTORY

In April 2024, Mr. Duda filed this complaint against Defendants, alleging that they had violated FOIA by failing to comply with statutory deadlines (Count I), ECF No. 1 ¶¶ 29-36; unlawfully withholding records (Count II), *id.* ¶¶ 37-47; and failing to grant Mr. Duda a fee benefit (Count III), *id.* ¶¶ 48-55.  After Defendants filed an answer in May 2024, the court ordered the parties to meet and confer and submit a joint status report on Mr. Duda's FOIA request.

In June 2024, Defendants reported that they had identified a body of potentially responsive documents totaling roughly "thirty hours of audio that will require processing."  ECF No. 9, at 1. It anticipated processing "approximately thirty minutes per month[] [at] its standard processing rate for audio."  *Id.* at 2.  Because such a rate would take at least five years to complete, Mr. Duda sought expedited processing and expressed particular interest in prioritizing the production of the Bryant Audio.  *Id.* at 2-4.

In July 2024, the court convened a status conference to discuss the parties' disputes. July 1, 2024 Minute Entry.  Based on the representations at the hearing, the court ordered Defendants to produce, within two weeks, four hours of responsive audio that had already been processed.  July 1, 2024 Minute Order.  The court also requested a further status report on whether Defendants could more expeditiously process the Bryant Audio.  *Id.*  On July 15, Defendants confirmed that they could prioritize the Bryant Audio (totaling approximately one hour and forty minutes) and release it to Mr. Duda in two batches: one by the end of August and a second by the end of September.  ECF No. 10, at 2.  The court subsequently entered a minute order actualizing that schedule.  July 19, 2024 Minute Order.

In the first batch of the Bryant Audio, despite providing forty-four minutes and forty-seven seconds of the recording, Defendants withheld all but thirty-seven seconds of audio.  ECF No. 12,

at 1-2.  Mr. Duda subsequently filed a motion to convene a hearing and set a partial-summary-judgment briefing schedule for the entirety of the Bryant Audio.  *Id.* at 6-7.  The court denied the motion to the extent it requested a hearing but granted Mr. Duda's request to set a briefing schedule with respect to Defendants' withholding of large portions of the Bryant Audio.  Oct. 28, 2024 Minute Order.

In December 2024, Defendants filed a motion for partial summary judgment arguing that their withholdings of the Bryant Audio were proper under FOIA Exemptions 6, 7(C), and 7(D).[8] ECF No. 17.  In January 2025, Mr. Duda filed a cross-motion for partial summary judgment.  ECF No. 21.  Both motions are fully briefed.  ECF Nos. 17, 21, 22, 29, 30, 32.[9]

## III.    LEGAL STANDARDS

"[T]he vast majority of FOIA cases can be resolved on summary judgment."  *Brayton v. Off. of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).  Summary judgment may be awarded to the agency if it can demonstrate that no material facts are in dispute, that it conducted an adequate search for responsive records, and that each record has either been produced or is exempt from disclosure.  *Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 59 F. Supp. 3d 184, 189 (D.D.C. 2014).  The agency invoking a FOIA exemption bears the burden of demonstrating that it applies.  *U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489

---

[8] FOIA Exemptions 6 and 7(C) permit government agencies to withhold records if disclosing them "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6), (b)(7)(C).  Exemption 7(D), meanwhile, shields law-enforcement records if their disclosure "could reasonably be expected to disclose the identity of a confidential source[;] . . . and, in the case of a record or information compiled by [a] criminal law enforcement authority in the course of a criminal investigation . . . , information furnished by a confidential source." *Id.* § 552(b)(7)(D).

[9] In the interim, Defendants have continued to process and release batches of non-Bryant Audio recordings. ECF Nos. 15, 19, 25, 33, 35.

U.S. 749, 755 (1989).  This burden is met when agency affidavits or declarations "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)).

Even where the requested information falls comfortably within a FOIA exemption, the agency must still demonstrate that disclosure would result in foreseeable harm.  5 U.S.C. § 552(a)(8).  To satisfy this burden, the agency must "articulate both the nature of the harm [from release] and the link between the specified harm and specific information contained in the material withheld."  *Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 369 (D.C. Cir. 2021) (alteration in original) (quoting H.R. Rep. No. 114-391, at 9 (2016)).  The agency must come up with more than "generalized assertions" or "speculative or abstract fears" of harm.  *Id.* (first quoting *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020), then quoting S. Rep. No. 114-4, at 4 (2015)).  Instead, it "must provide 'a focused and concrete demonstration of why disclosure of the particular type of material . . . will, in the specific context of the agency action at issue, actually impede' the interests protected by a FOIA exemption."  *Leopold v. Dep't of Just.*, 94 F.4th 33, 37 (D.C. Cir. 2024) (quoting *Reps. Comm. for Freedom of the Press*, 3 F.4th at 370).

## IV.    DISCUSSION

The parties disagree over three main issues.  First, they dispute whether the FBI properly invoked Exemption 7(D) to shield materials related to a confidential source.  Next, they debate the FBI's separate invocation of Exemptions 6 and 7(C) to prevent unwarranted invasions of the personal privacy of third parties.  Finally, they argue over whether the FBI fulfilled its duty to

segregate and disclose non-exempt information. The court agrees with Mr. Duda on the latter two points, but requires *in camera* review to definitively resolve the first.

### A.    Exemption 7(D)

While FOIA's "limited exemptions" play a key role in protecting sensitive information from the public eye, "disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976). That said, Exemption 7(D) is considered to "afford[] the most comprehensive protection of all of FOIA's law enforcement exemptions." *Billington v. Dep't of Just.*, 301 F. Supp. 2d 15, 22 (D.D.C. 2004). Under Exemption 7(D), an agency may withhold "records or information compiled for law enforcement purposes" if their disclosure "could reasonably be expected to disclose the identity of a confidential source" or "information furnished by a confidential source." 5 U.S.C. § 552(b)(7)(D).[10] A source is "deemed confidential if the source furnished information with the understanding that the FBI would not divulge the communication except to the extent the Bureau thought necessary for law enforcement purposes." *U.S. Dep't of Just. v. Landano*, 508 U.S. 165, 174 (1993). If the agency establishes confidentiality, "both the identity of the source and the information he or she provided will be immune from FOIA disclosure" unless the requester produces "absolutely solid evidence showing that the source . . . has manifested complete disregard for confidentiality. *Dow Jones & Co. v. Dep't of Just.*, 917 F.2d 571, 576-77 (D.C. Cir. 1990). If, however, "the exact information given to the FBI has

---

[10] "A record is 'compiled for law enforcement purposes' so long as there is (1) a rational 'nexus' between the record and the agency's law enforcement duties, and (2) a connection between the subject of the record and a possible security risk or violation of federal law." *Levinthal v. Fed. Election Comm'n*, 219 F. Supp. 3d 1, 6 (D.D.C. 2016) (quoting *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 32 (D.C. Cir. 1998)). The parties do not dispute that the Bryant Audio was "compiled for law enforcement purposes." *See* ECF No. 21-1, at 13-21.

already become public, and the fact that the informant gave the same information to the FBI is also public, there would be no grounds to withhold." *Id.* at 577.

Assurances of confidentiality must be determined on a case-by-case basis; there is "no[] . . . presumption that a source is confidential within the meaning of Exemption 7(D) whenever [a] source provides information [to law enforcement] in the course of a criminal investigation." *Landano*, 508 U.S. at 181. Instead, Exemption 7(D) turns on whether the source of the information received an express or implied assurance of confidentiality.

### 1.    Express assurance of confidentiality

The court begins with whether Defendants have provided "probative evidence that the source did in fact receive an express grant of confidentiality." *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 34 (D.C. Cir. 1998) (quoting *Davin v. U.S. Dep't of Just.*, 60 F.3d 1043, 1061 (3d Cir. 1995)). Such assurances can take the form of "notations on the face of a withheld document, the personal knowledge of an official familiar with the source, a statement by the source, or contemporaneous documents discussing practices or policies for dealing with the source or similarly situated sources." *Id.* The agency must "present sufficient evidence," *Roth v. Dep't of Just.*, 642 F.3d 1161, 1184 (D.C. Cir. 2011), to "permit meaningful judicial review" of whether an express assurance was given, *id.* (quoting *Campbell*, 164 F.3d at 34).

Mr. Duda asserts that Defendants' evidence falls short for two main reasons. First, he argues that the FBI's declaration from Michael G. Seidel, who is the section chief of the Record/Information Dissemination Section in the FBI's Information Management Division, ECF No. 17-1 ¶ 1, is far too conclusory to establish an express assurance because Mr. Seidel has no personal knowledge of the Bryant Audio witness's interactions with the FBI, ECF No. 21-1, at 14-16. Second, and more critically, Mr. Duda claims that bickering over confidentiality in this

particular case is pointless because the public already knows the witness's identity: supposedly, Mr. Bayless. *Id.* at 17-19. Defendants—through Mr. Seidel's declaration—respond that the Bryant Audio witness *did* receive an express assurance of confidentiality from the FBI. ECF No. 17, at 12-13. They also maintain that Mr. Duda's second argument rests "on a false premise— that Mr. Bayless . . . , who[m] Plaintiff believes was the confidential source protected from disclosure—was in fact the confidential source protected from disclosure." ECF No. 29, at 2. Given the parties' competing assertions, the court concludes that *in camera* review is the only way to resolve this question.

Mr. Seidel's declaration puts it rather plainly. In it, Mr. Seidel avers that "[t]he FBI was able to determine [that] its investigators granted [the Bryant Audio witness] an express assurance of confidentiality because it located positive indicators in the related records that the individual requested, and was granted, an assurance of confidentiality." ECF No. 17-1 ¶ 25. He further explains that FBI employees, "pursuant to standard practice, expressly promised this third party that [his or her] identity and the information [he or she] provided would remain confidential." *Id.*

Mr. Duda counters that Mr. Seidel did not have personal knowledge of—and was not even with the Bureau during—the FBI's 2004 investigation into Mr. Till's murder. ECF No. 21-1, at 15; *see* ECF No. 17-1 ¶ 1 (explaining that Mr. Seidel joined the FBI in 2011). In Mr. Duda's view, then, the declaration cannot offer anywhere near the level of "detail and specificity" required to justify a withholding under FOIA. ECF No. 21-1, at 15 (quoting *Campbell*, 164 F.3d at 30). Mr. Duda offers the declaration of Dale Killinger as a direct rebuttal. Mr. Killinger served in the FBI from 1996 to 2018 and was "the case agent who led the FBI's 2004 investigation into the kidnap and murder of Emmett Till." ECF No. 21-8 ¶ 2. By Mr. Killinger's own telling, "[he was]

13

the individual who received [the Bryant Audio] on behalf of the FBI in 2005 and know[s] that the individual who provided this recording is now deceased." *Id.* ¶ 6.[11]

Mr. Killinger further attests that the record evidence seriously undermines Defendants' assertions of confidentiality. As he explains, and as the FBI's *own* investigative report confirms, the person who provided the FBI with the Bryant Audio was a "cooperating witness." ECF No. 21-6, at 90; ECF No. 21-8 ¶ 12. A "cooperating witness is someone who agrees to assist the government in prosecuting a criminal defendant by providing testimony or other valuable information." ECF No. 21-8 ¶ 12. According to Mr. Killinger, such witnesses "know that their identity[] and the information they provide[] [are] likely to be disclosed if criminal prosecution is pursued." *Id.* This sets them apart from "confidential informants," who "do not agree to provide testimony and would expect the FBI to protect their identity." *Id.*

In a supplemental declaration, Mr. Seidel tries to contest this by contending that the "[c]ooperating [w]itness" designation "is a positive indication [that] this individual entered into an official, confidential relationship with the FBI in which he or she would have, by standard FBI practice, been provided with the FBI's express assurance of confidentiality." ECF No. 29-1 ¶ 15. It is unclear, however, if Mr. Seidel's "evidence . . . [of] confidentiality" is supported by anything beyond "positive indicators in the related records." ECF No. 17-1 ¶ 25. One possible reading is that Mr. Seidel—who does not have personal knowledge of the Bryant Audio collection but is generally "familiar[] with the documents in question," ECF No. 29-1 ¶ 1—concluded that the witness received an express assurance of confidentiality *because* he or she was classified as a

---

[11] In a supplemental declaration, Mr. Seidel asserts that "[t]he FBI's promises of confidentiality are not diminished when an investigation is closed, or by the passage of time, or even by the death of the source." ECF No. 29-1 ¶ 14.

"cooperating witness." That runs headlong into the contradictory declaration of Mr. Killinger, the lead agent who actually "received [the Bryant Audio] recording on behalf of the FBI in 2005" and states that cooperating witnesses "know that their identity[] and the information they provide[] [are] likely to be disclosed if criminal prosecution is pursued." ECF No. 21-8 ¶¶ 6, 12.

The biggest problem for Defendants, however, is that their own actions may have already given the game away. If the individual who provided the Bryant Audio is indeed Mr. Bayless, as Mr. Duda asserts, then the FBI's disclosure of his communications in the Form FD-71 suggests that he did not receive any guarantees of confidentiality. Presumably, the FBI would not reveal the identity of a witness in a public disclosure if that witness asked for, and was granted, an assurance that the Bureau "would not divulge the communication." *Landano*, 508 U.S. at 174. Mr. Killinger's declaration provides further support for this point. He states that, when filling out a Form FD-71, "FBI employees . . . affirmatively determine if the complainant's identity can be disclosed, or if they need their identity protected." ECF No. 21-8 ¶ 20. If the "Protect Identity box" is not checked (like on the Form FD-71 bearing Mr. Bayless's name), that means that the complainant "did not request [that] his identity be protected." *Id.*[12]

Conversely, if the Bryant Audio witness was *not* Mr. Bayless, or if further information reveals that Mr. Bayless was given an express assurance of confidentiality, then Defendants are far likelier to succeed on their Exemption 7(D) argument. If that is the case, the source remains either unknown or confidential and all the grave harms of divulging the identity of a confidential source may justify the exemption. *See* ECF No. 17-1 ¶¶ 23-24 (explaining that revealing the

---

[12] Assuming that Mr. Bayless *was* the Bryant Audio witness and that he *was* given an assurance of confidentiality, the FBI's handling of the Form FD-71 raises—at the very least—an interesting question of whether its own disclosure dissolves an assurance of confidentiality.

identity of a confidential source both jeopardizes their safety and creates a "chilling effect on the activities and cooperation of other sources"). That said, the FBI would still have to reckon with the fact that it revealed statements from the Bryant Audio to the public in its 2006 report. Specifically, it would need to explain how an express assurance of confidentiality would have allowed some disclosures in 2006, but not other disclosures from the same recording in 2024.

In short, if the Bryant Audio witness was Mr. Bayless, then the record evidence undermines Defendants' assertions that the witness requested or was given confidentiality. If the witness was *not* Mr. Bayless (or if it *was* Mr. Bayless, but he received an express assurance of confidentiality and the FBI can justify its handling of the Form FD-71 and its 2006 disclosure), Defendants may still have a significant interest in protecting their source. Other than through *in camera* review, the court sees no way to cut through the parties' warring declarations. Such review will permit the court to determine the basis for Mr. Seidel's assertions that express assurances were granted and reach a definitive conclusion on whether the Exemption 7(D) withholdings were proper. *See* 5 U.S.C. § 552(a)(4)(B) (granting a court the ability to "examine the contents of . . . agency records in camera to determine whether such records or any part thereof shall be withheld under any [FOIA] exemptions"); *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 577-78 (D.C. Cir. 1996) ("This Circuit has interpreted [FOIA] to give district court judges broad discretion in determining whether in camera review is appropriate.").

## 2.    Implied assurance of confidentiality

Turning next to whether there was an implied assurance of confidentiality, the court considers four factors: (1) "the character of the crime at issue," (2) "the source's relation to the crime," (3) "whether the source received payment," and (4) "whether the source has an ongoing relationship with the law enforcement agency and typically communicates with the agency only at

locations and under conditions which assure the contact will not be noticed." *Labow v. U.S. Dep't of Just.*, 831 F.3d 523, 531 (D.C. Cir. 2016) (quoting *Roth*, 642 F.3d at 1184). While "[i]t may be true that many, or even most, individual sources will expect confidentiality," there is no automatic "presum[ption]" that an implied assurance exists. *Landano*, 508 U.S. at 176.

If there were an implied assurance here, it would obviate the need to conduct *in camera* review on the express-assurance question. On balance, however, the court concludes that the Bryant Audio witness did not have an implied assurance of confidentiality.

The first factor "contemplates that sources likely expect confidentiality when they report on serious or violent crimes, risking retaliation." *Labow*, 831 F.3d at 531; *see Hodge v. Fed. Bureau of Investigation*, 703 F.3d 575, 581 (D.C. Cir. 2013) (holding that the character of the crime may support an inference of confidentiality, "particularly if the criminal activity is 'of a type inclined toward violent retaliation'" (quoting *Mays v. Drug Enf't Admin.*, 234 F.3d 1324, 1331 (D.C. Cir. 2000))). The crime here was clearly a serious one, thus increasing the level of risk to any cooperating individual. *See Landano*, 508 U.S. at 179 (reasoning that a witness to a gang-related murder would expect confidentiality); *cf. Richardson v. U.S. Dep't of Just.*, 730 F. Supp. 2d 225, 238 (D.D.C. 2010) (same for attempted murder). This factor thus weighs in favor of finding an implied assurance of confidentiality.

The second factor "consider[s] the source's relationship to the crime, because sources divulging nonpublic, identifying information are more 'vulnerable to retaliation.'" *Labow*, 831 F.3d at 531 (quoting *Mays*, 234 F.3d at 1330). Defendants claim that the danger was particularly high because the witness "was in a position to have close proximity with [Mr.] Bryant" and that "[Mr.] Bryant was unaware that the [witness] was recording the discussions." ECF No. 17-1 ¶ 28. As a result, the witness "risked harm when cooperating with the FBI because[,] at the time of the

recording[,] [he or she] was within the orbit of an individual known to have been involved in a crime of extreme violence."  ECF No. 17, at 14.  But this distorts the timeline of events in an attempt to manufacture a sense of danger.  While the witness was in close proximity to Mr. Bryant at the time of the recording *in 1985*, that does not mean he or she was in danger at the time they turned the recording over to the FBI *in 2005*, well after Mr. Bryant had died.  *See* ECF No. 21-8 ¶ 6 (confirming that the witness turned over the Bryant Audio in 2005).  Indeed, the witness "was unaffiliated with law enforcement at the time" of the recording, ECF No. 21-6, at 90, and there was no active law enforcement investigation ongoing (nor would there be for another two decades), *see* ECF No. 21-5, at 2.  By the time the witness decided to come forward with his information, nearly everyone known to be involved in the crime was already dead.  *See* ECF No. 21-6, at 20-31. Therefore, this second factor significantly undercuts any expectation of implied confidentiality.

The third factor simply asks whether the source was paid for his or her information.  There are no indications that that occurred here.  Accordingly, this factor weighs against confidentiality.

Finally, the fourth factor examines "the duration of the source's relationship with law enforcement and the manner of communication," with "[c]onsistent and secretive communications indicat[ing] a source's expectation of confidentiality."  *Labow*, 831 F.3d at 532.  Here, as far as the FBI's report reveals, the interaction between the Bryant Audio witness and law enforcement appears to have been fleeting.  There are no indications that the source, who was not even associated with law enforcement at the time of the recording, maintained a long-lasting relationship with the FBI.  Defendants make no arguments to the contrary.  *See* ECF No. 17, at 14 (arguing that the Bryant Audio witness received an implied assurance of confidentiality "based on the violent nature of the crime . . . and the source's proximity to those involved," but not based on any relationship with law enforcement); ECF No. 29, at 9-10 (same).

Despite the seriousness of the crime involved, the combination of all the relevant factors suggests that there was not any implied assurance of confidentiality. Most notably, the attenuated relationship between the source and those involved in the murder at the time the Bryant Audio was exchanged significantly reduces the expectation of confidentiality.

*    *    *

Because the appropriateness of Exemption 7(D) depends on whether the Bryant Audio witness had an express guarantee of confidentiality, the court concludes that *in camera* review is necessary. Otherwise, the court cannot "meaningful[ly] . . . review" the appropriateness of the exemption. *Roth*, 642 F.3d at 1184 (quoting *Campbell*, 164 F.3d at 34). Until then, the court reserves judgment on this issue.[13]

## B.    Exemptions 6 and 7(C)

Regardless of the court's ultimate ruling on Exemption 7(D), Defendants have withheld *other* portions of the Bryant Audio pursuant to Exemptions 6 and 7(C). Exemption 6 shields "personnel and medical files and similar files[,] the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). For its part, Exemption 7(C) protects "records or information compiled for law enforcement purposes" if disclosing those

---

[13] The court recognizes that, in issuing a ruling following its *in camera* review, it may imply that Mr. Bayless was or was not the Bryant Audio witness. Defendants presumably do not want that information to come to light. But because the FBI did not keep Mr. Bayless's identity hidden, *see* ECF No. 21-8 ¶ 18, the record strongly suggests that Mr. Bayless did not receive an express guarantee of confidentiality. If that is the case, Mr. Duda is entitled to know whether Mr. Bayless was the Bryant Audio witness. Conversely, if the court concludes that Exemption 7(D) applies after reviewing the relevant materials *in camera*, it either means that Mr. Bayless was not the source of the Bryant Audio or that he was given an express assurance of confidentiality. Such a ruling would maintain the status quo and presumably be acceptable to Defendants.

records "could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C).

For both Exemptions 6 and 7(C), the court must weigh the "privacy interest in non-disclosure against the public interest in the release of the records in order to determine, on balance, whether disclosure would work a clearly unwarranted invasion of personal privacy." *Lepelletier v. Fed. Deposit Ins. Corp.*, 164 F.3d 37, 46 (D.C. Cir. 1999). The D.C. Circuit has held—and Defendants readily admit—that this test is "essentially the same" for both exemptions. *Jud. Watch, Inc. v. Dep't of Just.*, 365 F.3d 1108, 1125 (D.C. Cir. 2004); *see* ECF No. 17-1 ¶ 8 n.4 ("[T]he analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion."). Accordingly, the court only needs to consider the applicability of Exemption 6 if Exemption 7(C) does not apply. *See Reps. Comm. for Freedom of the Press*, 489 U.S. at 762 n.12 ("Because Exemption 7(C) covers this case, there is no occasion to address the application of Exemption 6.").

Here, the disputed withholdings under Exemptions 6 and 7(C) entirely concern "the names and other identifying information of third parties merely mentioned in the audio recordings." ECF No. 17-1 ¶ 15. Such third parties are covered by FOIA's protective sweep, but to varying degrees. *See Davis v. Dep't of Just.*, 968 F.2d 1276, 1281 (D.C. Cir. 1992). "[P]ersons involved in FBI investigations—even if they are not the subject of the investigation—'have a substantial interest in seeing that their *participation* remains secret.'" *Id.* (alteration in original) (emphasis added) (quoting *Fitzgibbon v. Cent. Intel. Agency*, 911 F.2d 755, 767 (D.C. Cir. 1990)). Other third parties "*mentioned* in FBI investigative records"—but who do not contribute to law enforcement activities—"'may have a similarly strong interest in non-disclosure.'" *Id.* (emphasis added) (quoting *King v. U.S. Dep't of Just.*, 830 F.2d 210, 233 (D.C. Cir. 1987)); *see Fitzgibbon*, 911 F.2d

at 767 ("It is surely beyond dispute that 'the mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation.'" (quoting *Branch v. Fed. Bureau of Investigation*, 658 F. Supp. 204, 209 (D.D.C. 1987))).  That said, incidental mentions of passive third parties may only trigger "relatively insignificant" privacy concerns.  *Davis*, 968 F.2d at 1281.  This lowest-tier of privacy interests may still prevail, however, if "the public interest in disclosure is virtually nonexistent."  *Id.*  And although the events giving rise to the FBI's investigation in this case are seventy years old, most courts recognize that "[t]he passage of time, without more, does not materially diminish [privacy] interests."  *Schrecker v. U.S. Dep't of Just.*, 349 F.3d 657, 666 (D.C. Cir. 2003).

While time alone may not tip the scales in favor of disclosure, privacy interests typically dissolve once a person is deceased.  *See id.* at 661; ECF No. 17-1 ¶ 20.  An agency must therefore take "basic steps to ascertain whether an individual [is] dead or alive."  *Schrecker*, 349 F.3d at 661 (quoting *Schrecker v. U.S. Dep't of Just.*, 254 F.3d 162, 167 (D.C. Cir. 2001)).  Failure to do so makes it impossible to "say whether the Government reasonably balanced the interests in personal privacy against the public interest in release."  *Schrecker*, 254 F.3d at 167.

If the FBI cannot confirm someone's death, it employs a routine method to assess the individual's life-or-death status.  Normally, it tries to use the person's birth date and the date of the investigation to determine if the person is still alive.  ECF No. 17-1 ¶ 20.  For an audio recording, where there is no date of birth to analyze, the FBI relies on the dates of the investigation and recording.  *Id.*  When these methods fail "to determine the life/death status of an individual," "the name of the individual is withheld pursuant to Exemptions 6 and 7(C)[] when [the FBI] finds disclosure would constitute an unwarranted invasion of those individuals' privacy should they still be living."  *Id.*

In their reply brief, however, Defendants somewhat obfuscate the precise methodology employed by the FBI to ascertain life-or-death status in *this* case. They explain that, "[i]n the instant context of an audio recording where . . . there is no specific date of birth for the FBI to analyze," the FBI "presumed individuals were deceased based on the 100-year rule." ECF No. 29, at 13.[14] The obvious problem with this method, however, is that it requires a birth date as a baseline. *See Schrecker*, 349 F.3d at 660 (explaining that the 100-year rule "presumes that an individual is dead *if his or her birth date appears in the responsive record* and is more than 100 years old" (emphasis added)). Without one, the agency cannot even begin to guess whether the individual is dead or alive.

Defendants contend that the D.C. Circuit has repeatedly upheld the 100-year rule. *See* ECF No. 29, at 17. That is true enough, but even the Circuit has identified the precise problem that plagues Defendants here. The Court has stressed that the rule only works "[*w*]*hen birth dates are provided in responsive records*." *Davis v. Dep't of Just.*, 460 F.3d 92, 100 (D.C. Cir. 2006) (quoted source omitted). "The key to the utility of the FBI's 100-year rule is the clause that [the Court] italicized"—i.e., the existence of a discernible birth date. *Id.* Without such a date, "this . . . method [is] destined to fail." *Id.*; *see id.* ("The reasonableness of this . . . method obviously depends upon the probability that the responsive records will contain the individual's birth date[.]"). The Court's treatment of the rule in *Davis* confirms that Defendants cannot rely on it here.

The FBI's problem is further compounded by the fact that "the names mentioned in the audio recording lack clear identifiers," leaving the FBI with "insufficient information . . . to allow [it] to conduct a reasonable search within open source databases or internal records." ECF

---

[14] The 100-year rule presumes that individuals who are 100-years old or younger are still alive if their deaths cannot be confirmed with certainty. *See Schrecker*, 349 F.3d at 660.

No. 29-1 ¶¶ 7-8.  If that is true, then it is entirely unclear what foundation the FBI based its 100-year-rule presumption on.  Without more, it appears as though the agency was simply guessing as to life-or-death status.  That cannot be enough, especially when virtually everyone else with a known connection to Mr. Till's murder is already known to be dead.  *See* ECF No. 21-6, at 20-31.

But even assuming that the third parties appearing in the Bryant Audio are still alive, this does not end the matter.  The court must still determine if their privacy interests outweigh the public's interest in shedding light on agency action.  On this score, the court agrees with Mr. Duda.

According to the Seidel declarations, the FBI determined that the relevant privacy interests prevailed each time a third party's voice or name "c[ould] be heard in the background of the audio recordings."  ECF No. 17-1 ¶ 19 n.5.  But while these individuals still retain some interest in not appearing in a law-enforcement record, it is unlikely that every single mention of a third party in the Bryant Audio would constitute an *unwarranted* invasion of privacy, especially if those mentions were only in passing or carried no incriminating implication.  *See* ECF No. 17-1 ¶ 21 (explaining that "[t]hese individuals were not of investigative interest to the FBI").  This is especially so given that "the names mentioned in the audio recording lack clear identifiers," to the point that not even the FBI could "conduct a reasonable search" for their identities.  ECF No. 29-1 ¶¶ 7-8.  It is unclear how these individuals can hold significant privacy interests when even *the FBI*—our country's leading investigative agency—cannot find enough useful information to tie these names or voices to any identifiable person who is alive today.

For the same reasons, Defendants cannot "concretely" show that disclosure would result in foreseeable harm.  *Cf. Am. Immigr. Council v. U.S. Customs & Border Patrol*, 590 F. Supp. 3d 306, 333 (D.D.C. 2022) (quoting *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369) (addressing the deliberative-process privilege).  Of course, there is always a generalized fear that

being associated with law enforcement in any form could generate public backlash or stigma. But merely speculating that such harms will befall these difficult-to-identify third parties is not enough to defeat FOIA's primary purpose of shedding light on government activities when the countervailing public interest is strong.

Here, the weight on the other end of the scale is a hefty one. The murder of Emmett Till is one of the most consequential acts of racial violence in American history. *See, e.g.*, ECF No. 21-5, at 2, 4-9; ECF No. 21-6, at 7, 117, 133. It has been credited with igniting the modern civil rights movement at a time when debates about racial equality were particularly fraught. Because Mr. Duda seeks information that would shed light on the FBI's handling of this historically consequential crime, disclosure could "reveal much about the diligence of the FBI's investigation and the DOJ's exercise of its prosecutorial discretion: whether the government had the evidence but nevertheless pulled its punches." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 746 F.3d 1082, 1093 (D.C. Cir. 2014). While the lack of clear identifiers for the mentioned third parties makes it harder to confirm if law enforcement failed to prosecute certain individuals, the Bryant Audio as a whole is almost certain to provide critical insight into the final hours of Mr. Till's life, the circumstances surrounding his death, and other factual information that was available to the authorities during their investigations. Accordingly, the court concludes that Defendants' invocation of Exemptions 6 and 7(C) to redact all mentions of third parties in the Bryant Audio was unreasonable.

### C.    Segregability

Because the primary "focus" of FOIA "is information, not documents," "an agency cannot justify withholding an entire [record] simply by showing that it contains some exempt material." *Beltranena v. Clinton*, 770 F. Supp. 2d 175, 184 (D.D.C. 2011) (quoting *Mead Data Cent., Inc. v.*

*U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977)).  Therefore, under Section 552(b) of FOIA, "non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions."  *Mead Data Cent.*, 566 F.2d at 260.  In deciding whether an agency has fulfilled its obligation to produce non-exempt information, a court "may rely on government affidavits that show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated."  *Juarez v. Dep't of Just.*, 518 F.3d 54, 61 (D.C. Cir. 2008).  But the government must "provide[] a 'detailed justification'" and cannot rely on mere "'conclusory statements' to demonstrate that all reasonably segregable information has been released."  *Valfells v. Cent. Intel. Agency*, 717 F. Supp. 2d 110, 120 (D.D.C. 2010) (quoting *Mead Data Cent.*, 566 F.2d at 261).  While courts generally "presume[] that an agency has complied with its obligation to release segregable material," *Amiri v. Nat'l Sci. Found.*, 664 F. Supp. 3d 1, 22 (D.D.C. 2021), a plaintiff can "rebut this presumption . . . by introduc[ing] 'evidence that would warrant a belief by a reasonable person that the agency failed to comply with its obligation.'" *Rudometkin v. United States*, 140 F.4th 480, 494 (D.C. Cir. 2025) (quoting *Flyers Rts. Educ. Fund, Inc. v. Fed. Aviation Admin.*, 71 F.4th 1051, 1057-58 (D.C. Cir. 2023)).

The Seidel declarations contain just three paragraphs on segregability and assert that, of the one hour and forty minutes of Bryant Audio, only thirteen minutes and fifty-four seconds were not exempt.  ECF No. 29-1 ¶ 18 (explaining that the remaining "1 hour, 26 minutes, [and] 50 seconds" of the recording were protected by FOIA exemptions).  Of those roughly fourteen minutes, about one minute comprised audio that had already been released, and the remaining thirteen minutes were "white noise."  *Id.*  In total, then, out of the approximately 100 minutes of Bryant Audio, only a single substantive minute was non-exempt.

As Mr. Duda persuasively argues, "[t]o the extent redaction were deemed necessary [under Exemption 7(D)], the FBI could readily disclose the portions of the [Bryant] Audio containing the source's voice that do nothing to reveal his [or her] identity or, in the alternative, with modulation as a redaction method."  ECF No. 21-1, at 35.[15]  At the very least, Defendants must be able to "explain why the possibility of some similar method of segregability is unavailable."  *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 587 (D.C. Cir. 2020).  As for the withholdings justified under Exemptions 6 and 7(C), it is also unclear why the FBI could not simply redact any mention of a third party (assuming that those third parties' privacy interests override the weighty public interests at play, *but see supra* Part IV.B).

Defendants' response to these points, which spans only two pages, merely falls back on Mr. Seidel's declarations.  *See* ECF No. 29, at 17-19.  Mr. Seidel asserts, in a conclusory fashion, that almost an hour and a half of audio (out of a total one hour and forty minutes) had to be withheld "in its entirety" because it was "either fully covered by one or more of the cited FOIA exemptions" or "so intertwined with exempt material[] [that] no information could be reasonably segregated for release."  ECF No. 17-1 ¶ 33.  But given the nature of the claimed exemptions (specifically, the purported need to protect the identities of particular individuals), the court finds it hard to believe that only a single minute of substantive audio, or roughly 1% of the total recording, was the maximum amount of disclosable material.  After all, Defendants clearly possess the ability to strip audio from specific segments of the recording down to the second mark.  *See* ECF No. 12, at 3

---

[15] This pathway is only necessary if the Bryant Audio witness *did* receive an express assurance of confidentiality.  For that reason, the court will render a decision on Defendants' assertion of Exemption 7(D) *before* requiring any further productions of the Bryant Audio (with or without redactions).  *See infra* Part IV.D.

("Of [the] 44 minutes and 47 seconds[]" of Bryant Audio released in the first batch, "the FBI redacted approximately 44 minutes and 10 seconds—or approximately 99%.").

Even assuming that the FBI needed to redact information that could identify third parties or the cooperating witness, it is almost inconceivable that no more than a single minute of meaningful audio could be produced.  Mr. Seidel asserts that "[a]ny further segregation of this intertwined material would employ finite resources only to produce disjointed words, phrases, or sentences[] that . . . would have minimal or no informational content."  ECF No. 17-1 ¶ 33.  But, in a situation like this one, where there appears to be a logical delineation between what is and is not segregable under the agency's claimed exemptions, "it is not at all clear from the government's affidavit why it cannot segregate the portions of the record that do not [trigger the exemption]." *Evans*, 951 F.3d at 587.  Because the assertions in Defendants' affidavits create reasonable doubt on segregability, the court holds that Defendants have not satisfied their obligation to disclose non-exempt portions of the Bryant Audio.

### D.    *In Camera* Review and Next Steps

In the interest of efficiency, the court will first proceed with *in camera* review of the documents supporting Defendants' invocation of Exemption 7(D).  Based on that review, the court will determine whether Exemption 7(D) properly applies.  While the court could—in the interim—order the release of non-exempt portions of the Bryant Audio withheld pursuant to Exemptions 6 and 7(C), it concludes that efficiency is best served by requiring Defendants to make one cohesive production of the Bryant Audio after the court has fully resolved all disputed FOIA exemptions. So, even though Defendants will be required to produce at least some previously withheld portions of the Bryant Audio, they are relieved of their obligation to produce additional portions until the court issues a decision on the invocation of Exemption 7(D).

## V.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendants' motion for partial summary judgment, ECF No. 17, is **DENIED** and Plaintiff's cross-motion for partial summary judgment, ECF No. 21, is **GRANTED** with respect to Exemption 6, Exemption 7(C), and Defendants' duty to disclose reasonably segregable, non-exempt information.  It is further

**ORDERED** that the parties' motions are **DENIED** with respect to Exemption 7(D).  It is further

**ORDERED** that Defendants shall submit the documents supporting their assertion of Exemption 7(D), *in camera* and *ex parte*, to the court on or before September 4, 2025.  Defendants shall file a notice on the public docket indicating that they have transmitted the *in camera* documents.  It is further

**ORDERED** that Defendants shall file a renewed, *ex parte* motion for partial summary judgment with respect to withholdings of the Bryant Audio under Exemption 7(D) on or before September 18, 2025.  It is further

**ORDERED** that Defendants are relieved of their obligation to produce additional portions of the Bryant Audio until the court issues a decision on Defendants' invocation of Exemption 7(D).

**SO ORDERED.**

_____
LOREN L. ALIKHAN
United States District Judge

Date:    August 21, 2025