**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KELLY DUDA,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, *et al.*,<br><br>*Defendants*. | Civil Action No. 24 - 1048 (LLA) |

**<u>REDACTED MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Kelly Duda brings this action against the Department of Justice ("DOJ") and the Federal Bureau of Investigation ("FBI" or "Bureau") (collectively, "Defendants") alleging violations of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Mr. Duda seeks materials related to the investigation of Emmett Till's murder—as relevant here, a taped interview of Roy Bryant, one of the men who confessed to killing Mr. Till (the "Bryant Audio"). In August 2025, the court denied Defendants' motion for partial summary judgment, granted in part Mr. Duda's cross-motion for summary judgment, and permitted Defendants to file a renewed *ex parte* motion for partial summary judgment with respect to the application of FOIA Exemption 7(D) to the Bryant Audio. ECF No. 36. Defendants thereafter filed such a motion, which the court will refer to as Defendants' "*Ex Parte* Motion." Despite not having access to Defendants' motion, Mr. Duda filed a "supplemental reply" "to address the foreseeable harm analysis that should follow in the event that the Court determines that Exemption 7(D) applies to some or all of the Bryant Audio," ECF No. 43, at 1-3, which Defendants have moved to strike,

ECF No. 44. For the following reasons, the court denies Defendants' *ex parte* motion for partial summary judgment and grants Defendants' motion to strike Mr. Duda's proposed supplement.

## I. FACTUAL BACKGROUND

### A. The Murder of Emmett Till and Immediate Aftermath

In the summer of 1955, Mr. Till, a fourteen-year-old Black child, was visiting family (the Wrights) in Money, Mississippi. ECF No. 21-6, at 20-22.[1] On August 24, Mr. Till and a group of friends went to a local grocery store owned by Roy and Carolyn Bryant, a white married couple. ECF No. 21-5, at 2; ECF No. 21-6, at 38, 40. Mr. Bryant was outside the state at the time, so Mrs. Bryant was tending to the store with a relative. ECF No. 21-6, at 39-40. Mr. Till and his companions visited the store briefly and then left. *Id.* at 39. Mrs. Bryant subsequently claimed that Mr. Till, while in the store, had wolf-whistled at her. ECF No. 21-5, at 2, 19; ECF No. 21-6, at 40.

In the early morning of August 27, Roy Bryant and his half-brother, J.W. Milam, kidnapped Mr. Till from his relatives' home. ECF No. 21-6, at 12, 51. The two men, along with several others, took Mr. Till to a barn belonging to J.W. Milam's brother. *Id.* at 25, 89. There, they brutally beat, shot, and murdered Mr. Till. ECF No. 21-5, at 2; ECF No. 21-6, at 89-90. To dispose of Mr. Till's body, Mr. Bryant and Mr. Milam tied a seventy-pound cotton gin fan to Mr. Till's neck using barbed wire and submerged him in the Tallahatchie River. ECF No. 21-6, at 90, 133. Mr. Till's body was not discovered for four days. *Id.* at 68.

---

[1] The citations to ECF Nos. 21-3, 21-5, 21-6, 21-7, refer to the ECF-generated page numbers at the top of each page rather than any internal pagination.

Almost immediately after Mr. Till's disappearance, local authorities arrested Mr. Bryant and Mr. Milam based on eyewitness reports of their suspicious activity. *Id.* at 67. The two men stood trial for murder in September 1955. *Id.* at 81. At trial, Mrs. Bryant testified for the defense "that [Mr.] Till had propositioned her and physically touched her hand, arm[,] and waist while they were both inside the store." ECF No. 21-7, at 3. After four days, both men were acquitted by an all-white, all-male jury. ECF No. 21-5, at 2. No further attempts to prosecute the crime ever took place, and no other suspects were ever charged. *Id.*

Mr. Till was laid to rest in early September 1955. ECF No. 6, at 37. His mother, Mamie Till Mobley, insisted on an open-casket funeral, which was attended by more than 50,000 people. ECF No. 21-5, at 6. Photographs of the funeral services, including of Mr. Till's "mutilated corpse[,] horrified the nation and became a catalyst for the bourgeoning civil rights movement." *Id.* at 6-7.[2]

Having been acquitted of the crime, Mr. Bryant and Mr. Milam confessed to the murder only a few months later. ECF No. 21-5, at 19-21. William Bradford Huie, a journalist, paid Mr. Milam, Mr. Bryant, and Mrs. Bryant a total of $3,150 for their stories. *Id.* at 23. Mr. Milam, Mr. Bryant, and Mrs. Bryant signed releases giving Mr. Huie the right to "to publish, produce, dramatize, adapt[,] or otherwise present" the story of Mr. Till's murder based on their statements. *Id.* Mr. Huie published an account of Mr. Till's murder based on their statements in the

[2] Mr. Till's murder took place against the backdrop of significant, racially charged violence in Mississippi. In May 1955, Willie George Washington Lee, a Black minister and the first Black person to register to vote in Humphrey's County, Mississippi, was shot and killed. ECF No. 21-6, at 16. No one was arrested for or charged with the crime. *Id.* In August 1955, Lamar Smith, a World War II veteran and advocate for Black voting rights, was murdered on a courthouse lawn in Brookhaven, Mississippi. *Id.* at 17. Three white men were arrested, but a grand jury did not return any indictments. *Id.*

January 1956 edition of *Look* magazine. *Id.* at 18-19. Mr. Huie wrote that both Mr. Bryant and Mr. Milam assaulted Mr. Till, and Mr. Milam confessed to shooting Mr. Till. *Id.* at 21. Mr. Huie also reproduced Mrs. Bryant's allegations that Mr. Till had "squeezed her hand," asked "about a date," and then grabbed her by the waist. *Id.* at 19 (internal quotation marks omitted). Mr. Huie's article ended by stating that "[t]he majority—by no means *all*, but the *majority*—of the white people in Mississippi 1) either approve[d] of [Mr.] Milam's action or else 2) they d[id]n't disapprove enough to risk giving their 'enemies' the satisfaction of a conviction." *Id.* at 21. Mr. Milam passed away in 1980, Mr. Bryant passed away in 1994, and Mrs. Bryant passed away in 2023. ECF No. 21-6, at 24-25, 115.

### B. The FBI's 2004 Investigation into Mr. Till's Murder

Almost half a century later, in 2004, the FBI launched a new investigation into Mr. Till's murder "in an effort to determine if other individuals were involved in the[] crimes and to bring forth state indictments against th[o]se individuals if . . . appropriate." ECF No. 21-6, at 6.[3] By then, only four known witnesses were still alive: Mrs. Bryant, ECF No. 21-5, at 40; Willie Reed, who saw Mr. Till in the back of a truck at J.W. Milam's brother's farm on the day he was kidnapped and provided critical testimony at the murder trial, ECF No. 21-6, at 138-40; Simeon Wright, Mr. Till's cousin who was with Mr. Till when he was kidnapped, *id.* at 142-44;

[3] At the time of Mr. Till's murder, Congress had yet to pass any federal hate-crime statutes. ECF No. 21-7, at 3. The FBI initiated its 2004 investigation, in part, to determine whether any individuals could be charged under such statutes. *Id.*

and Wheeler Parker, Jr., who was with Mr. Till at the Bryants' grocery store and at the Wrights' home the night of the kidnapping, *id.* at 146-54.[4]

The FBI published a redacted version of its investigative findings on Mr. Till's murder ("FBI Report") in February 2006. ECF No. 21-1, at 7; ECF No. 21-6, at 5. In a section titled "Roy Bryant's Admission," the FBI reported that:

> In 1985, an individual, who is now a cooperating witness, but who was unaffiliated with law enforcement at the time, hereinafter referred to as [REDACTED], met with Roy Bryant and approached him about [REDACTED]. [REDACTED] and Bryant rode together to the Wright home, Bryant's Meat Market and Grocery[,] and to the barn where Till had been beaten and killed. During the trip[,] [REDACTED] was equipped with an audio cassette recorder and successfully recorded portions of their conversation.

ECF No. 21-1, at 7 (footnote omitted). The FBI Report went on to quote from the recordings. The Report explained that when asked about the kidnapping of Mr. Till, Mr. Bryant had said that he and Mr. Milam had planned to "put [Mr. Till's] ass in the river," that they had "done whopped the son of a bitch," and that "carryin' him to the hospital wouldn't have done him no good." *Id.* at 7-8. The Report also reflected that Mr. Bryant had told the cooperating witness: "I'm the only one who's livin' that knows it . . . . That's all that will ever be known." *Id.* at 8.[5]

Mr. Duda and other third parties believe the witness to be Luster Bayless, a Hollywood costume designer who had become interest in making a film about Mr. Till's murder. ECF No. 21-7, at 29; *see* ECF No. 21-3, at 3. Mr. Bayless passed away in February 2022. ECF

---

[4] Mr. Reed passed away in 2013, ECF No. 21-6, at 138-40, and Mr. Wright passed away in 2017, *id.* at 142-44. Mr. Parker is believed to be the last living witness of Mr. Till's final days. *Id.* at 146-64.

[5] Writing for *The Atlantic* magazine, journalist Wright Thompson published an extensive article about Mr. Till's murder and hypothesized that this audio recording "is likely the only existing description of what happened inside the barn in the final hour of Till's life." ECF No. 21-7, at 29.

No. 21-3, at 3. In July 2022, in response to a FOIA request, ECF No. 21-1, at 10, the FBI released a copy of a June 2005 Form FD-71 that documented a call between Mr. Bayless and the FBI, ECF No. 21-8 ¶ 18.

Specifically, on June 7, 2005, at approximately 10:08 p.m., Mr. Bayless had contacted the FBI about turning over a recording he had in connection with "the Emmit Teal [sic] case." ECF No. 21-8 ¶ 18. Mr. Bayless explained that he had "t[aken] a ride with a gentleman by the name of Roy Brown [sic] and possesse[d] a tape of the conversation." *Id.* The FBI agent who documented Mr. Bayless's call on the FBI's Form FD-71 did not check the box for "Protect Source" but did report that Mr. Bayless "would like to be protected from anyone who would wish to harm him." *Id.* The officer also noted that Mr. Bayless had given a copy of the recording to the National Archives and Records Administration ("NARA"). *See id.*

[redacted] An FBI agent later transcribed details from a June 13 interview with Mr. Bayless, referring to him as an "Individual" and describing the audio he provided as a conversation between Mr. Bryant, a "CONFIDENTIAL SOURCE," and a third named individual. *Id.* Ex. D. [redacted]

At the end of the investigation, the FBI concluded that it could not pursue any potential federal charges due to the relevant statutes of limitations. ECF No. 21-5, at 2. But because additional state charges were still possible, *see* ECF No. 21-6, at 113, the FBI turned its evidence over to the Leflore County district attorney's office, *id.* at 156. The county empaneled a grand

jury, but it did not return any indictments. *Id.* The FBI subsequently closed its investigation in December 2007. *Id.*

### C. Mr. Duda's FOIA Request

Kelly Duda is a freelance journalist "currently exploring the circumstances surrounding the murder of Emmett Till in connection with a forthcoming journalistic project." ECF No. 21-3 ¶¶ 1-2. In March 2024, Mr. Duda submitted a FOIA request to the FBI for:

1. All audio recordings made by Luster Bayless and provided to the FBI;
2. The full audio recording(s) from which the FBI Report quotes portions on page 92 [(i.e., ECF No. 21-6, at 91)];
3. All audio recordings of Roy Bryant;
4. Any and all other audio recordings in the FBI's file concerning its investigations into Till's death.

ECF No. 17, at 2. Mr. Duda also asserted that, as "a representative of the news media, [he was] only required to pay for the direct cost of [the] duplication of records." ECF No. 17-2, at 3. He explained that "[t]his information is being sought in connection with the production of a journalistic project about Till, which will be available to the public." *Id.* Mr. Duda stated, however, that he was "willing to pay up to $100" for duplication costs. *Id.* Later that month, the FBI informed Mr. Duda that it had encountered "unusual circumstances" in processing his request and would need additional time. ECF No. 17-4, at 2 (quoting 5 U.S.C. § 552(a)(6)(B)(iii)).

## II. PROCEDURAL HISTORY

In April 2024, Mr. Duda filed this complaint against Defendants, alleging that they had violated FOIA by failing to comply with statutory deadlines (Count I), ECF No. 1 ¶¶ 29-36; unlawfully withholding records (Count II), *id.* ¶¶ 37-47; and failing to grant Mr. Duda a fee benefit

(Count III), *id.* ¶¶ 48-55. After Defendants filed an answer in May 2024, ECF No. 5, the court ordered the parties to meet and confer and submit a joint status report on Mr. Duda's FOIA request, ECF No. 7.

In June 2024, Defendants reported that they had "identified a body of potentially responsive documents" totaling roughly "thirty hours of audio that will require processing." ECF No. 9, at 1. Defendants anticipated that the FBI would process "approximately thirty minutes per month[] [at] its standard processing rate for audio." *Id.* at 2. Because processing at such a rate would take at least five years to complete, Mr. Duda sought expedited processing and expressed particular interest in prioritizing the production of the Bryant Audio. *Id.* at 2-4.

In July 2024, the court convened a status conference to discuss the parties' disputes. July 1, 2024 Minute Entry. Based on the representations at the hearing, the court ordered Defendants to produce, within two weeks, four hours of responsive audio that had already been processed. July 1, 2024 Minute Order. The court also requested a further status report explaining whether Defendants could more expeditiously process the Bryant Audio. *Id.* On July 15, Defendants confirmed that they could prioritize the Bryant Audio (totaling approximately one hour and forty minutes) and release it to Mr. Duda in two batches: one by the end of August and a second by the end of September. ECF No. 10, at 2. The court subsequently entered a minute order adopting that schedule. July 19, 2024 Minute Order.

In the first batch of the Bryant Audio, despite producing forty-four minutes and forty-seven seconds of the recording, Defendants redacted all but thirty-seven seconds of audio. ECF No. 12, at 1-2. Mr. Duda subsequently filed a motion to convene a hearing and set a briefing schedule for summary judgment concerning the Bryant Audio. *Id.* at 6-7. The court denied the motion to the

extent it requested a hearing but granted Mr. Duda's request to set a briefing schedule with respect to Defendants' withholding of large portions of the Bryant Audio. Oct. 28, 2024 Minute Order.

In December 2024, Defendants filed a motion for partial summary judgment, arguing that their withholdings of the Bryant Audio were proper under FOIA Exemptions 6, 7(C), and 7(D).[6] ECF No. 17. In January 2025, Mr. Duda filed a cross-motion for partial summary judgment. ECF No. 21. In August 2025, the court issued a memorandum opinion and order denying Defendants' motion and granting Plaintiff's cross-motion with respect to Exemption 6 and 7(C), and Defendants' duty to disclose reasonably segregable, non-exempt information. ECF No. 36, at 28. As to Exemption 7(D), which applies if the source of the information received either an express or implied assurance of confidentiality, the court concluded that the source of the Bryant Audio lacked any implied assurance of confidentiality. ECF No. 36, at 16-19. But the court held that *in camera* review of the Bryant Audio and the FBI's related documentation was necessary to determine whether the source had received an express assurance of confidentiality. *Id.* at 16. The court accordingly instructed Defendants to file a renewed, *ex parte* motion for partial summary judgment with respect to withholding the Bryant Audio under Exemption 7(D) and to submit the documents supporting their assertion of the exemption *in camera*. *Id.* at 28. The court further concluded that Defendants were relieved of their obligation to produce additional portions of the Bryant Audio until the court decided the renewed motion. *Id.*

---

[6] FOIA Exemptions 6 and 7(C) permit government agencies to withhold records if disclosing them "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Exemption 7(D), meanwhile, shields law-enforcement records if their disclosure "could reasonably be expected to disclose the identity of a confidential source[;] . . . and, in the case of a record or information compiled by [a] criminal law enforcement authority in the course of a criminal investigation . . . , information furnished by a confidential source." *Id.* § 552(b)(7)(D).

Following the court's decision, Defendants have continued to process and send several batches of non-Bryant-Audio materials to Mr. Duda. *See* ECF Nos. 37, 45, 48, 49, 52. Additionally, pursuant to the court's memorandum opinion and order, Defendants have filed a renewed, *ex parte* motion for partial summary judgment. *See* ECF Nos. 38, 42. Mr. Duda has filed a supplemental reply brief in support of his motion for partial summary judgment, ECF No. 43, which Defendants have moved to strike, ECF No. 44. That motion to strike is fully briefed. ECF Nos. 44, 46, 47.

## III. LEGAL STANDARD

"[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Off. of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011). An agency is entitled to summary judgment if it can demonstrate that no material facts are in dispute, that it conducted an adequate search for responsive records, and that each record either has been produced or is exempt from disclosure. *Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 59 F. Supp. 3d 184, 189 (D.D.C. 2014). The agency invoking a FOIA exemption bears the burden of demonstrating that the exemption applies. *U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989). It must provide agency affidavits or declarations that "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)).

Even where the requested information falls comfortably within a FOIA exemption, the agency must still demonstrate that disclosure would result in foreseeable harm. 5 U.S.C. § 552(a)(8)(A)(i)(I). To satisfy this burden, the agency must "articulate both the nature of the

harm [from release] and the link between the specified harm and specific information contained in the material withheld." *Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 369 (D.C. Cir. 2021) (alteration in original) (quoting H.R. Rep. No. 114-391, at 9 (2016)). The agency must come up with more than "generalized assertions" or "speculative or abstract fears" of harm. *Id.* (first quoting *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020); then quoting S. Rep. No. 114-4, at 4 (2015)). Instead, it "must provide 'a focused and concrete demonstration of why disclosure of the particular type of material . . . will, in the specific context of the agency action at issue, actually impede' the interests protected by a FOIA exemption." *Leopold v. U.S. Dep't of Just.*, 94 F.4th 33, 37 (D.C. Cir. 2024) (quoting *Reps. Comm. for Freedom of the Press*, 3 F.4th at 370).

## IV. DISCUSSION

### A. Motion to Strike

Defendants have moved to strike Mr. Duda's supplemental memorandum in support of his partial motion for summary judgment, contending that it is an impermissible surreply that is unnecessary given that the court has already resolved the parties' cross-motions for summary judgment. ECF No. 44, at 1, 3. Mr. Duda responds that his filing was appropriate because Defendants, at the court's direction, filed a renewed *ex parte* motion for partial summary judgment, and, while he lacks access to that *ex parte* filing, he nevertheless "wishe[s] to provide the Court facts and argument that are relevant to the resolution of the pending dispute." ECF No. 46, at 1-2. While surreplies are "generally disfavored," *Kifafi v. Hilton Hotels Ret. Plan*, 736 F. Supp. 2d 64, 69 (D.D.C. 2010), *aff'd*, 701 F.3d 718 (D.C. Cir. 2012), "[i]t is within the court's authority to grant leave to file a sur-reply when 'the party making the motion would [otherwise] be unable to contest matters presented to the court for the first time in the opposing party's reply,'" *Lopez v. Council*

*on Am.-Islamic Rels. Action Network, Inc.*, 657 F. Supp. 2d 104, 108 (D.D.C. 2009) (quoting *Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001)), *aff'd per curiam*, 383 F. App'x 1 (D.C. Cir. 2010). "[A] surreply is not a vehicle for rehashing arguments that have already been raised and briefed by the parties." *Crummey v. Soc. Sec. Admin.*, 794 F. Supp. 2d 46, 63 (D.D.C. 2011), *aff'd per curiam*, No. 11-5231, 2012 WL 556317 (D.C. Cir. Feb. 6, 2012). For a court to conclude that a surreply is appropriate, the opposing party's reply must have raised "truly new" arguments. *THEC Int'l-Hamdard Cordova Grp.-Nazari Constr. Co., Ltd. Joint Venture v. Cohen Mohr, LLP*, 301 F. Supp. 3d 1, 6 (D.D.C. 2018) (quoting *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 270, 277 (D.D.C. 2002)). The court also considers "whether the movant would be unduly prejudiced were leave to be granted." *Doe v. Exxon Mobil Corp.*, 69 F. Supp. 3d 75, 85 (D.D.C. 2014) (quoting *Banner Health v. Sebelius*, 905 F. Supp. 2d 174, 187 (D.D.C. 2012)). Ultimately, "[t]he decision to grant or deny leave to file a sur-reply is committed to the sound discretion of the court." *Flynn v. Veazey Constr. Corp.*, 310 F. Supp. 2d 186, 189 (D.D.C. 2004).

Rather than seeking leave to file a supplement or surreply, Mr. Duda simply attaches his proposed supplement. ECF No. 43. The court is disinclined to grant leave to file to a movant who, appearing through counsel, failed to argue that he satisfied the applicable legal standard. And the surreply functionally "rehash[es]" arguments that Mr. Duda made in his previous briefing, namely, that no foreseeable harm would result from disclosure of the Bryant Audio in light of the Civil Rights Cold Case Records Collection Act of 2018 ("RCA"), Pub. L. No. 115-426, § 8(a)(2), 132 Stat. 5489, 5501 (2019) (codified at 44 U.S.C. § 2107). *Compare* ECF No. 43, at 6-7 (arguing that because Congress, "through the RCA[,] . . . has abrogated confidentiality for deceased confidential sources in civil rights cold cases[,] . . . there cannot be foreseeable harm under FOIA"), *with* ECF

No. 21, at 24 (arguing that the RCA evinces Congress's determination that "no foreseeable harm will come from disclosing the identity of deceased confidential sources in investigations like this one"), *and* ECF No. 32, at 14-15 (similar). To the extent that Mr. Duda wishes to alert the court to the publication of records related to Mr. Till's death, the court may take judicial notice of "information posted on official public websites of government agencies." *Arab v. Blinken*, 600 F. Supp. 3d 59, 63 n.1 (D.D.C. 2022). Because Mr. Duda did not seek leave and is not entitled to file a surreply, the court will grant Defendants' motion to strike the brief. *See Est. of Fakhoury v. Islamic Republic of Iran*, No. 21-CV-1218, 2022 WL 3355799, at *4 (D.D.C. Aug. 15, 2022) (granting a motion to strike a surreply where the plaintiff failed to obtain leave to file the surreply and used it to raise new arguments).

**B. FOIA**

While FOIA's "limited exemptions" play a key role in protecting sensitive information from the public eye, "disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976). That said, Exemption 7(D) is considered to "afford[] the most comprehensive protection of all of FOIA's law enforcement exemptions." *Billington v. Dep't of Just.*, 301 F. Supp. 2d 15, 22 (D.D.C. 2004). Under Exemption 7(D), an agency may withhold "records or information compiled for law enforcement purposes" if disclosure of those records "could reasonably be expected to disclose the identity of a confidential source" or "information furnished by a confidential source." 5 U.S.C. § 552(b)(7)(D).[7] The Exemption 7(D) inquiry

[7] "A record is 'compiled for law enforcement purposes' so long as there is (1) a rational 'nexus' between the record and the agency's law enforcement duties, and (2) a connection between the subject of the record and a possible security risk or violation of federal law." *Levinthal v. Fed. Election Comm'n*, 219 F. Supp. 3d 1, 6 (D.D.C. 2016) (quoting *Campbell v. U.S. Dep't of Just.*,

(*continued on next page*)

focuses on the expectations of the source at the time he or she provided information. A source is "deemed confidential if the source furnished information with the understanding that the FBI would not divulge the communication except to the extent the Bureau thought necessary for law enforcement purposes." *U.S. Dep't of Just. v. Landano*, 508 U.S. 165, 174 (1993).

A court must assess assurances of confidentiality on a case-by-case basis; there is "no[] . . . presumption that a source is confidential within the meaning of Exemption 7(D) whenever [a] source provides information to [law enforcement] in the course of a criminal investigation." *Id.* at 181. Instead, Exemption 7(D) turns on whether the source of the information received an express or implied assurance of confidentiality. *Id.* at 172.

The court concluded in its prior memorandum opinion that "the Bryant Audio witness did not have an implied assurance of confidentiality." ECF No. 36, at 17. As for an express assurance of confidentiality, the court explained that Defendants' evidence was insufficient to establish that the witness had in fact received an assurance of confidentiality. *Id.* at 12-16. The court noted that the parties' declarations were contradictory as to whether a "Cooperating Witness" designation by the FBI suffices to establish that the witness had spoken under an assurance of confidentiality. *Id.* at 14-15. But the court explained that "the biggest problem for Defendants" was that, "[i]f the individual who provided the Bryant Audio is indeed Mr. Bayless, as Mr. Duda asserts, then the FBI's disclosure of his communications in the Form FD-71 suggests that he did not receive any guarantees of confidentiality." *Id.* at 15. The court also noted that if Mr. Bayless was indeed the Bryant Audio witness and he was in fact given an express assurance of confidentiality, that would

164 F.3d 20, 32 (D.C. Cir. 1998)). The parties do not dispute that the Bryant Audio was "compiled for law enforcement purposes." *See* ECF No. 21-1, at 13-21.

"raise[]—at the very least—an interesting question of whether [the FBI's] own disclosure dissolves an assurance of confidentiality." *Id.* at 15 n.12.

Having received Defendants' renewed motion and supplemental materials, the court begins with the question whether the witness who provided the Bryant Audio—whom the FBI now confirms was Mr. Bayless, *Ex Parte* Mot., at 4—"spoke with an understanding that the communication would remain confidential," *Landano*, 508 U.S. at 172, and responses to Mr. Duda's previous arguments about confidentiality in light of Defendants' renewed motion. The court next assesses whether the FBI waived any assurance of confidentiality by its disclosure of the Form FD-71. The court then turns to whether disclosure may result in foreseeable harm.

**1. Whether Mr. Bayless received an express assurance of confidentiality**

In *Landano*, the Supreme Court explained that although "FOIA does not define the word . . . confidentiality," it "is not limited to complete anonymity or secrecy" as a matter of "common usage." 508 U.S. at 173. Rather, "[a] statement can be made 'in confidence' even if the speaker knows the communication will be shared with limited others, as long as the speaker expects that the information will not be published indiscriminately." *Id.* The Court "assume[d] that Congress . . . must have realized that some FBI witnesses would testify at trial." *Id.* But the court rejected that the prospect of future public testimony was sufficient to defeat an assurance of confidentiality because if Exemption 7(D) was "so limited" as to "cover[] only sources who reasonably could expect total anonymity[, it] would be, as a practical matter, no exemption at all." *Id.* at 174. The Exemption 7(D) inquiry instead turns on the expectations of the source at the time he or she spoke; "at the time an interview is conducted, neither the source nor the FBI agent ordinarily knows whether the communication will be disclosed" at some point in the future. *Id.* Thus, "[a] source should be deemed confidential [for purposes of Exemption 7(D)] if the source

furnished information with the understanding that the FBI would not divulge the communication except to the extent the Bureau thought necessary for law enforcement purposes." *Id.*[8]

"To withhold information under Exemption 7(D) by express assurance of confidentiality, [Defendants] must present 'probative evidence that the source did in fact receive an express grant of confidentiality.'" *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 34 (D.C. Cir. 1998) (quoting *Davin v. U.S. Dep't of Just.*, 60 F.3d 1043, 1061 (3d Cir. 1995)). "Such evidence can take a wide variety of forms, including notations on the face of a withheld document, the personal knowledge of an official familiar with the source, a statement by the source, or contemporaneous documents discussing practices or policies for dealing with the source or similarly situated sources." *Id.* The crux of the inquiry is whether the agency has provided a "sufficiently detailed explanation of the basis for the agency's conclusion" to "permit meaningful judicial review." *Id.*

The court had previously questioned whether a cooperating-witness classification sufficed to establish that the Bryant Audio witness had an express assurance of confidentiality because the parties' declarations appeared to contradict each other. *See* ECF No. 36, at 14-15. Mr. Duda provided a declaration from Dale Killinger, the FBI agent who had led the 2004 investigation into Mr. Till's murder. *See* ECF No. 21-8. Mr. Killinger explained that, because cooperating witnesses

---

[8] A "Cooperating Witness" receives less robust protections than a "Confidential Informant[]," whom the government expects not only to provide helpful information once but to continue providing information "regarding felonious criminal activities . . . in the future." *See* U.S. Dep't of Just. Off. of the Inspector Gen., *The Federal Bureau of Investigation's Compliance with the Attorney General Investigative Guidelines* 1 (2005), *available at* https://perma.cc/7484-7PUF. Confidential informants thus "usually can preserve their anonymity," *id.* at 64, but specific circumstances may indicate that a Cooperating Witness has availed himself of an expectation of confidentiality. The FBI appears to use "Cooperative Witness" and "Cooperating Witness" interchangeably, even in this case. *Compare* Napier Decl. ¶ 6 (referring to Mr. Bayless as a "Cooperative Witness"), *with id.* ¶¶ 12, 16 (noting that he was referred to as a "Cooperating Witness" in his investigative file).

"agree[] to assist the government in prosecuting a criminal defendant by providing testimony or other valuable information," those witnesses "know that their identity, and the information they provided, is likely to be disclosed if criminal prosecution is pursued." *Id.* ¶ 12; *see* ECF No. 36, at 14-15. Mr. Duda accordingly argued that "[t]he fact that the person who provided the [Bryant] Audio was identified as a 'cooperating witness' reveals nothing about whether he was promised confidentiality and, if so, what the scope of that agreement was." ECF No. 21-1, at 19. Mr. Duda further argued that the FBI's July 2022 release of the Form FD-71 documenting a conversation between Mr. Bayless and the FBI constitutes "contrary evidence showing that the source of the Bryant Audio did not request—and was not provided—an assurance of confidentiality." *Id.* at 17.

For their part, Defendants provided two declarations from Michael G. Seidel, who was the section chief of the Record/Information Dissemination Section of the FBI's Information Management Division. ECF No. 17-1 ¶ 1; *see* ECF No. 29-1. Mr. Seidel stated that a "Cooperating Witness" designation "is a positive indication [that an] individual entered into an official, confidential relationship with the FBI in which he or she would have, by standard FBI practice, been provided with the FBI's express assurance of confidentiality." ECF No. 29-1 ¶ 15. He further explained that "[t]he FBI was able to determine [that] its investigators granted [the Bryant Audio witness] an express assurance of confidentiality because it located positive indicators in the related records that the individual requested, and was granted, an assurance of confidentiality." ECF No. 17-1 ¶ 25. Mr. Duda responded that Mr. Seidel's declarations were insufficient because Mr. Seidel did not join the FBI until after the agency's investigation into Mr. Till's murder was closed, meaning that he lacked "personal knowledge of whether [Mr.] Bayless was given an express promise of confidentiality," and because the declarations

otherwise failed to "identify any relevant documents in support of its assertion." ECF No. 21-1, at 16.

Given the competing declarations, the court concluded that *in camera* review was warranted to evaluate the basis for Mr. Seidel's assertions that express assurances were granted and reach a definitive conclusion on whether the Exemption 7(D) withholdings were proper. ECF No. 36, at 16. In their renewed motion, Defendants again contend that Mr. Bayless provided the Bryant Audio under an express assurance of confidentiality, arguing that FBI agents' notations on contemporaneous documents demonstrate that Mr. Bayless furnished information under an express assurance of confidentiality *Ex Parte* Mot., at 4-7. As support, they provide a declaration from Amie Marie Napier, the FBI Section Chief who oversees the agency's FOIA unit ("Napier Declaration"), accompanied by exhibits substantiating their claim, *see id.* Exs. A to F. Defendants further argue that the FBI's July 2022 disclosure of Mr. Bayless's Form FD-71 does not warrant a contrary conclusion. *Id.* at 7-8. Having reviewed the materials, the court concludes that the FBI had given Mr. Bayless an express assurance of confidentiality before he provided the Bryant Audio and that the Form FD-71 does not warrant a different conclusion.

*a. The FBI's new declaration and supporting documentation*

In their renewed motion, Defendants explain that the FBI officially deemed Mr. Bayless a "Cooperating Witness" on [redacted] when it completed what is known as a [redacted]. *Ex Parte* Mot. at 5; *see id.* Ex. A; Napier Decl. ¶ 6. [redacted] *Id.* Ex. A, at 2. Mr. Bayless was then

[redacted] and a case identification number. *Id.* Ex. A, at 1. Ms. Napier explains that the "CW" reference "in an FBI investigative file is a positive indication that the individual entered into an official, confidential relationship with the FBI in which [the individual] would have been provided with an express assurance of confidentiality." Napier Decl. ¶ 16. The FBI also assigned Mr. Bayless a symbol source number and a confidential source file number, notations that the FBI assign to "Confidential Human Sources [] who report information to the FBI on a regular basis under express assurances of confidentiality." *Id.*; *see Ex Parte* Mot. Ex. A; *see also id.* Ex. D (describing Cooperating Witness #1 with reference to the same case identification number used on the [redacted]). As Ms. Napier explains, "the FBI did not refer to Mr. Bayless by his true name within the investigation records" and instead referred "only [to] his assigned permanent source symbol number to further protect his identity within FBI records." Napier Decl. ¶ 16; *see Ex Parte* Mot. Ex. D (using the confidential file number and using the word "Individual" throughout the summary in place of Mr. Bayless's name); *id.* (describing the Bryant Audio as "a recorded conversation between a CONFIDENTIAL SOURCE," Mr. Bryant, and a third named individual). And when the FBI closed its file on Mr. Bayless in [redacted], it again used only his confidential source number and additionally checked a box indicating that Mr. Bayless's relationship was not "ever disclosed outside of the Department of Justice." *Id.* Ex. F. Even in [redacted], the agent continued to reference Mr. Bayless only by his permanent source symbol number. *Id.* Ex. E.

Taken together, these documents constitute probative evidence that, Mr. Bayless disclosed the Bryant Audio under an express assurance of confidentiality. While Mr. Duda was correct that Defendants' previous evidence failed to "identify any relevant documents in support of its assertions" of express confidentiality, ECF No. 21-1, at 16, Defendants have now cured that defect

by providing specific contemporaneous documents with notations indicating that Mr. Bayless had been expressly promised confidentiality.

The cases on which Mr. Duda relied in his motion for partial summary judgment only underscore the court's conclusion. *See* ECF No. 21, at 15-17. In *Electronic Privacy Information Center v. Drug Enforcement Agency* ("*EPIC*"), 192 F. Supp. 3d 92 (D.D.C. 2016), the court concluded that the "government ha[d] failed to meet its burden" of demonstrating an express assurance of confidentiality where the agency did "not (1) attach declarations from the agents who extended the promise of confidentiality, (2) produce any FBI document supporting the grant of confidentiality, or (3) submit evidence of a consistent policy granting confidentiality to designated sources during the relevant time period." *Id.* at 111. The court in *EPIC* ordered submission of relevant documents for *in camera review*, *id.*, just as the court did here, ECF No. 36, at 28.[9] Similarly, in *Electronic Frontier Foundation v. Department of Justice*, No. 15-CV-3186, 2016 WL 7406429 (N.D. Cal. Dec. 22, 2016), the court held that the government failed to meet its burden where the government provided "no indication it ever told [the sources that] their names would be held in confidence." *Id.* at *14. But here, Defendants have now produced several documents substantiating their argument that the FBI did in fact grant Mr. Bayless an express assurance of confidentiality.

Other cases in this district confirm the court's conclusion. In *Clemente v. Federal Bureau of Investigation*, 741 F. Supp. 2d 64 (D.D.C. 2010), the court recognized that "it is the FBI's

---

[9] The court did not issue a subsequent opinion on the validity of the withholdings pursuant to Exemption 7(D) because the government in that case subsequently withdrew the part of its summary judgment motion that relied on Exemption 7(D) and produced the relevant materials. *See* Notice of Partial Withdrawal, *Elec. Privacy Info. Ctr. v. Drug Enf't Agency*, No. 14-CV-317, ECF No. 41, at 2-4 (D.D.C. Sep. 4, 2018).

practice to assign source symbols to informants only if those individuals report information to the FBI on a regular basis pursuant to an express grant of confidentiality." *Id.* at 87 (internal quotation marks and citation omitted). The court deemed that "averment [] sufficient to demonstrate that those informants [with source symbols] qualify as" confidential sources, whose disclosures to the FBI were properly withheld under Exemption 7(D). *Id.*; *see Shapiro v. Dep't of Just.*, No. 12-CV-313, 2020 WL 3615511, at *33 (D.D.C. July 2, 2020), *aff'd in part, remanded in part sub nom. Shapiro v. U.S. Dep't of Just.*, 40 F.4th 609 (D.C. Cir. 2022) (concluding that "[a] document containing a CW designation . . . constitutes probative evidence that an express assurance of confidentiality was given"); *Boehm v. Fed. Bureau of Investigation*, 948 F. Supp. 2d 9, 33-34 (D.D.C. 2013) (concluding that designations of "Protected Identify [sic]," "Cooperating Witness," and "Cooperating Source" sufficed to demonstrate "that the information withheld was from confidential sources" and thus properly withheld under Exemption 7(D) (internal quotation marks omitted)); *Amuso v. U.S. Dep't of Just.*, 600 F. Supp. 2d 78, 99 (D.D.C. 2009) (crediting the FBI declarant's explanation that "all symbol numbered sources are given an express grant of confidentiality" and concluding on that basis that "the information provided by [] symbol numbered sources" was properly withheld under Exemption 7(D) (internal quotation marks and citation omitted)).

*b. Responding to Mr. Duda's arguments in light of the new evidence*

In his motion for partial summary judgment, Mr. Duda made three arguments that Mr. Bayless either was not given an express assurance of confidentiality or that it has since expired. He argued that the FBI's disclosure of the June 2005 Form FD-71 reflects that the FBI had not provided an assurance of confidentiality, ECF No. 21-1, at 17-18, that the disclosure of the FBI report "reveals to the public precisely the information that Bayless provided," *id.* at 18, and that

the Bryant Audio source's identity "has become widely known to the public through the *Atlantic* article" and based on Mr. Bayless's daughter's email to Mr. Duda, *id.* at 19. The court addresses each in turn.

*Mr. Bayless's Form FD-71.* As explained *supra* pp. 22-23, in July 2022, the FBI released a copy of a June 7, 2005 Form FD-71 that documented a call between Mr. Bayless and the FBI. ECF No. 21-8 ¶ 18. On the form, which contained no redactions, the FBI agent who had taken Mr. Bayless's call noted that Mr. Bayless wanted to "turn over" a recording he had made in which Mr. Bryant confessed to killing Mr. Till. *Id.* The agent did not check the box on the Form FD-71 for "Protect Source" but did report that the Mr. Bayless "would like to be protected from anyone who would wish to harm him." *Id.* ¶ 18-19. In seeking partial summary judgment, Mr. Duda argued that the Form FD-71 constitutes "contrary evidence showing that the source of the Bryant Audio did not request—and was not provided—an assurance of confidentiality" because the box for "Protect Source" was not checked. ECF No. 21-1, at 10, 17-18 (quoting ECF No. 21-8 ¶ 19); *see* ECF No. 21-8 ¶¶ 19-20. As support, Mr. Duda relied on Mr. Killinger's statement in his declaration that, "[t]he fact that the Protect Identity box was not checked on this FD-71 reveals that Mr. Bayless did not request his identity be protected when speaking to the FBI on June 7, 2005." ECF No. 21-8 ¶ 20.

On the record then before it, the court was inclined to agree that the Form FD-71 was relevant to the confidentiality analysis. ECF No. 36, at 15. The court explained that "[i]f the individual who provided the Bryant Audio is indeed Mr. Bayless . . . , then the FBI's disclosure of his communications in the Form FD-71 suggests that he did not receive any guarantees of confidentiality," because "[p]resumably, the FBI would not reveal the identity of a witness in a public disclosure if that witness asked for, and was granted, an assurance that the Bureau 'would

not divulge the communication.'" *Id.* at 15 (quoting *Landano*, 508 U.S. at 174). But on the record now before it, the court understands that Mr. Bayless was given an express assurance of confidentiality *after* the Form FD-71 was completed, and, accordingly, the Form FD-71 is not relevant evidence—let alone "contrary evidence"—bearing on the question of confidentiality.

As Ms. Napier explains, Form FD-71 is an intake form that the FBI "[o]ften" fills out when a person calls with a tip or complaint after normal business hours. Napier Decl. ¶ 8. The "Protect Source" box exists "to indicate if the individual's identity should be incorporated into FBI systems, as some Complainants and Tipsters prefer not to be contacted again or have their identities placed in FBI record keeping systems." *Id.* Thus, the agent's failure to check the "Protect Source" box on Mr. Bayless's Form FD-71 indicates merely that "[Mr.] Bayless did not wish to be anonymous *to the FBI* and did not object to [the] entry of his information into FBI records and databases." *Id.* ¶ 9 (emphasis added). [redacted]

When Mr. Bayless contacted the FBI on June 7, 2005, he lacked any official confidential relationship with the FBI. *Cf. Ex Parte* Mot. Ex. A (opening cooperating witness file on Mr. Bayless on [redacted]). The unchecked "Protect Identity" box on his Form FD-71 is thus wholly consistent with Defendants' argument that the FBI later granted Mr. Bayless an express assurance of confidentiality.[10] By [redacted], when the FBI opened its investigative file, it labeled

[10] What is more, the court is skeptical that the Form FD-71 even supports the limited proposition that Mr. Bayless did not seek an assurance of confidentiality at the time he initiated contact with

(*continued on next page*)

Mr. Bayless as a cooperative witness, indicating that he had been assured confidentiality. *See id.* ¶¶ 8-9.

Defendants' other exhibits support this timeline. An FBI agent interviewed Mr. Bayless on June 13, and Mr. Bayless provided the agent with the audio and other research materials to be "reviewed, copied if pertinent to the investigation, and returned to the individual [i.e., Mr. Bayless]." *Ex Parte* Mot. Ex. D. When an agent later transcribed the interview, he referred to Mr. Bayless only as an "Individual," and described the Bryant Audio as "a recorded conversation between a CONFIDENTIAL SOURCE," Mr. Bryant, and a third named individual. *Id.* Ex. D. The FBI's behavior after June 7—referring to Mr. Bayless by his code name and his source file and avoiding use of identifying information—tracks Ms. Napier's explanation that the FBI would have offered Mr. Bayless an assurance of confidentiality only after evaluating the veracity and quality of his tip.

*The FBI's February 2026 report.* Mr. Duda next argued that the February 2006 FBI Report "suggests that [Mr. Bayless] was not assured that his identity would be kept confidential and was certainly not assured that the information he provided—the recordings—would be kept confidential." ECF No. 21-1, at 18. The court disagrees. The FBI Report is heavily redacted, consistent with the source having received an enduring assurance of confidentiality. To the extent

---

the FBI. While it is true that the "Protect Source" box is unchecked, the summary of the call states that "the complainant would like to be protected from anyone who would wish to harm him." ECF No. 21-8 ¶¶ 18-19. Ms. Napier explains that this statement does not itself assure confidentiality; [redacted] Napier Decl. ¶ 8. Nonetheless, to the extent that Mr. Duda wishes to rely on the FBI agent's failure to check the "Protect Source" box as probative of whether Mr. Bayless sought confidentiality, he wholly fails to contend with the statement that the Mr. Bayless "would like to be protected." *See* ECF No. 21-1, at 17-18; ECF No. 21-8 ¶¶ 18-20.

that Mr. Duda seeks to argue that the FBI Report suggests that any confidentiality assurance was "intended by all parties to expire after a certain time," *id.* (quoting *Irons v. Fed. Bureau of Investigation*, 880 F.2d 1446, 1448 (1st Cir. 1989)), the D.C. Circuit has made clear that "Congress has not established a time limitation for exemption 7(D) and it would be both impractical and inappropriate for [a] [c]ourt to do so," *Keys v. U.S. Dep't of Just.*, 830 F.2d 337, 347 (D.C. Cir. 1987) (internal quotation marks and citation omitted).

*The article in* The Atlantic *and Mr. Bayless's daughter.* Finally, Mr. Duda pointed to an article in *The Atlantic* discussing Mr. Bayless and an email from Mr. Bayless's daughter indicating that Mr. Bayless had turned over the Bryant Audio as evidence that the FBI never extended an assurance of confidentiality to Mr. Bayless. ECF No. 21-1, at 19. But those records have little import because Exemption 7(D) turns on the understanding of *the source* at the time he or she spoke. *See Landano*, 508 U.S. at 171. The article in *The Atlantic* never indicates that the writer or anyone he spoke with had knowledge of Mr. Bayless's relationship to the FBI, *see generally* ECF No. 21-7, at 7-43, nor does Mr. Duda provide any evidence that Mr. Bayless's daughter was aware of the precise contours of her father's relationship with the FBI.

### 2. Waiver through the Form FD-71

In its previous opinion, the court independently questioned whether, if Mr. Bayless had disclosed the Bryant Audio under an express assurance of confidentiality, the FBI's subsequent disclosure of the Form FD-71 "dissolve[d] an[y] assurance of confidentiality." ECF No. 36, at 15 n.12. The court can now answer that question in the negative.

The D.C. Circuit has held that "the concept of 'waiver' does not apply to the FOIA Exemption 7(D)," adopting as persuasive then-Judge Breyer's First Circuit opinion. *Parker v. Dep't of Just.*, 934 F.2d 375, 380 (D.C. Cir. 1991) (citing *Irons*, 880 F.2d at 1448-57). It noted

that the text of Exemption 7(D) "says nothing at all about waiver" and that Exemption 7(D) protects information from a confidential source without any room for interest-balancing. *Id.* It also cited as persuasive "clear and unambiguous" legislative history showing that "Congress sought to provide a broad exemption." *Id.* And it concluded that the First Circuit's rejection of waiver was "both persuasive and consistent with the interpretation of [the D.C. Circuit] and the other circuits." *Id.* Courts in this Circuit have thus continually recognized that, "with limited exceptions not applicable here, the concept of waiver does not apply to withholdings made pursuant to Exemption 7(D)." *Shem-Tov v. Dep't of Just.*, 531 F. Supp. 3d 102, 116 (D.D.C. 2021) (footnote omitted) (rejecting a plaintiff's argument that public disclosure of "some or all of the information at issue or the identity of the [source]" could "waive the protection afforded to the confidential information and source by Exemption 7(D)"); *see Brown v. Fed. Bureau of Investigation*, No 21-CV-01639, 2023 WL 5333210, at *16 (D.D.C. Aug. 18, 2023), *aff'd*, 143 F.4th 481 (D.C. Cir. 2025), *cert. denied*, 146 S. Ct. 1608 (2026).

The *Parker* Court reserved the question whether a source's "actual testimony waives the right to nondisclosure," differentiating two unpublished cases from other districts in which courts held that a known informant's public testimony constituted waiver. 934 F.2d at 380-81. And another court in this district concluded that two sources had waived "any assurances of confidentiality . . . by writing books about their experiences as confidential FBI informants." *Blanton v. U.S. Dep't of Just.*, 63 F. Supp. 2d 35, 49. Here, there is no analogous evidence that Mr. Bayless himself waived his confidentiality interest. "Indeed, one reason that the caselaw requires an *unambiguous* waiver *by the confidential source itself* is to avoid precisely the type of speculation that Plaintiff employs about whether news articles and other public sources might—or might not—already reveal the confidential material at issue." *Shem-Tov*, 531 F. Supp. 3d at 116

n.6. The court is sympathetic to Mr. Duda's contention that Exemption 7(D)'s application feels strained in a case where the source is dead and the investigation is closed. But "[d]eath of a confidential source . . . is not relevant under exemption 7(D)." *Campbell*, 164 F.3d at 33 n.14.[11]

### 3. Foreseeable Harm

Even after establishing that Exemption 7(D) applies, Defendants bear the burden of demonstrating that disclosure of the requested documents would result in foreseeable harm. 5 U.S.C. § 552(a)(8)(A)(i)(I). The agency must "articulate both the nature of the harm [from release] and the link between the specified harm and specific information contained in the material withheld." *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369 (alteration in original) (quoting H.R. Rep. No. 114-391, at 9).

[11] In addressing foreseeable harm in the partial summary judgment briefing, Mr. Duda raised the related argument that Mr. Bayless's identity has "entered the public domain" and thus "may be disclosed notwithstanding any assurance of confidentiality" because "the FBI has already released a document disclosing his identity"—that is, the Form FD-71. ECF No. 21-1, at 23. While the D.C. Circuit has recognized that "the government cannot rely on an otherwise valid exemption to justify withholding information that . . . is in the 'public domain,'" the plaintiff bears "the burden of showing that there is a permanent public record of the exact portions he wishes." *Davis v. U.S. Dep't of Just.*, 968 F.2d 1276, 1279-80 (D.C. Cir. 1992) (quoting *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983)). This is an exacting requirement: "[c]ourts are forbidden 'from prying loose from the government even the smallest bit of information that is properly' withheld." *Kowal v. U.S. Dep't of Just.*, 107 F.4th 1018, 1030 (D.C. Cir. 2024) (quoting *Afshar*, 702 F.2d at 1130) (holding that even where "wiretapped conversations were made public at [a] trial," the plaintiff could not obtain "the FBI's narrative summary of those conversations" because the summary was not the "exact" record in the public domain (internal quotation marks and citation omitted)). Here, while Mr. Duda points to the Form FD-71 documenting that Mr. Bayless had called the FBI to explain that he had materials related to Mr. Till's murder, including recordings of Mr. Bryant, *see* ECF No. 21-1, at 24-25, Mr. Duda has not demonstrated "that there is a permanent public record of the *exact* portions he wishes," namely, a record showing that Mr. Bayless did in fact turn over the Bryant Audio. The public domain exemption is thus inapplicable to the identity of the Bryant Audio's source, and it is even further afield as it concerns the Bryant Audio itself.

Defendants make no arguments as to foreseeable harm in their renewed motion for summary judgment, *see generally Ex Parte* Mot., which is understandable given the odd posture of this case. And the court had no occasion to address foreseeable harm in its last opinion given its holding that that a determination on Exemption 7(D) required *in camera* review. *See* ECF No. 36, at 16, 27-28. Accordingly, the court will rely on the parties' previous arguments about foreseeable harm from the cross-motions for partial summary judgment. ECF No. 17, at 15-16; ECF No. 21-1, at 22-25; ECF No. 29, at 17. Defendants there explained that the FBI routinely relies on confidential sources and argued that any revelation endangering a confidential source's identity has a "chilling effect on the activities and cooperation of other sources." ECF No. 17, at 12; *see* Napier Decl. ¶ 18 (declaring that such a "chilling effect" would "diminish[] the FBI's capabilities in gathering useful information in its investigation"). Defendants relatedly contended that any disclosure "would display an unwillingness by FBI to honor its assurance of confidentiality" and "greatly hinder FBI's ability to recruit and maintain sources willing to provide accurate and relevant information pertaining to criminal activities." ECF No. 17, at 13 (citing ECF No. 17-1 ¶ 26).

In response, Mr. Duda claimed that Defendants' assertions of harm centered on witness deterrence are too generalized or "boilerplate" to satisfy the government's burden. ECF No. 21-1, at 23. To be sure, the D.C. Circuit has previously noted that the government fails to carry its burden when it merely "submit[s] a series of boilerplate and generic assertions that release of any [withheld] material would necessarily chill." *Reps. Comm. for Freedom of the Press*, 3 F.4th at 370. But the Court has more recently recognized that "the FBI has an institutional interest in ensuring witness cooperation in *future* investigations, not just its investigation" into the instant crime. *Brown v. Fed. Bureau of Investigation*, 143 F.4th 481, 488 (D.C. Cir. 2025), *cert. denied*,

146 S. Ct. 1608 (2026). In *Brown*, the Court affirmed the FBI's withholdings under Exemption 7(D) related to several witnesses who had provided information related to a 2015 terrorist attack. *Id.* at 484, 489. The Court explained that the foreseeable harm was "twofold." *Id.* at 488. First, "disclosure would create a risk of harm for witnesses" by exposing them to "reprisal and retaliation." *Id.* "Second," the Court credited the FBI's statement that "disclosure would undermine the efficacy of future witness interviews." *Id.* The Court found it "difficult to imagine a criminal investigation in which that interest would *not* be applicable" and expressed "doubt[] that the FBI needed to articulate any harm beyond the harm already identified in Congress's decision to create a special exemption for 'information furnished by a confidential source.'" *Id.* at 488-89 (quoting 5 U.S.C. § 552(b)(7)(D)).

Cases like *Brown* do not doom Mr. Duda's argument, however, because Mr. Duda has convincingly explained that this case presents an anomalous situation where Defendants' general statements about the chilling effects of disclosure are insufficient to establish foreseeable harm. Specifically, Mr. Duda contended that the RCA "already abrogated confidentiality for deceased sources in civil rights cold case investigations." ECF No. 32, at 2. Defendants hang their hats on the argument that disclosure will chill future witnesses, but in so doing, Defendants assume that the FBI can otherwise credibly promise witnesses that their identities and disclosures will remain confidential forever. *See* ECF No. 29, at 11. If Congress has abrogated confidentiality for witnesses like the Bryant Audio source under the RCA, it has already constrained the FBI's ability to make such promises. Put simply, no additional chill can result from *Mr. Duda's* request if *Congress* has already abrogated the relevant source's confidentiality.

The court concludes that, through the RCA, Congress has abrogated any assurance of confidentiality that the FBI has made to any source in a "civil rights cold case," including the

source of the Bryant Audio—and Defendants make no argument to the contrary. To begin, the RCA defines a "civil rights cold case record" as a record that:

> (A) is related to a civil rights cold case; and
>
> (B) was created or made available for use by, obtained by, or otherwise came into the possession of—
>
> > (i) the Library of Congress;
> >
> > (ii) the National Archives;
> >
> > (iii) any executive agency;
> >
> > (iv) any independent agency;
> >
> > (v) any other entity of the Federal Government; or
> >
> > (vi) any State or local government, or component thereof, that provided support or assistance or performed work in connection with a Federal inquiry into a civil rights cold case.

§ 2(3), 132 Stat. at 5489-90 (internal quotation marks omitted). The FBI is indisputably an "executive agency" for purposes of the RCA, but even if the FBI could attempt to argue otherwise, it would nevertheless fall within the RCA's capacious definition of "any other entity of the Federal Government." *Id.*[12]

The RCA then directs that "civil rights cold case records" be "transmitted" to NARA and tasks NARA with "mak[ing] available to the public" all such records. § 3(b), (e)(1)(A), 132 Stat. at 5491. Defendants do not dispute that the RCA covers records relating to the FBI's investigation of the murder of Mr. Till. *See generally* ECF No. 29. In fact, NARA has already released various

---

[12] Additionally, as explained above, the Form FD-71 indicates that Mr. Bayless provided the Bryant Audio to NARA directly. ECF No. 21-8 ¶ 18. If this is correct, the Bryant Audio is covered by the RCA twice over. *See* § 2(3)(B)(ii), 132 Stat. at 5489. Indeed, because the FBI turned over its evidence to Leflore County District Attorney's office, *see* ECF No. 21-6, at 156, then the Bryant Audio may be covered by the RCA thrice over, *see* § 2(3)(B)(vi), 132 Stat. at 5490.

records related to Mr. Till's murder "pursuant to the [RCA]." *Records Related to Emmett Louis Till, 2023-2025*, National Archives and Records Administration.[13]

The RCA contains provisions to protect confidential information, § 4(B)(2), 132 Stat. at 5494, but none applies to the Bryant Audio. As relevant here, the RCA permits "postponement" of the disclosure of civil rights cold case records if "disclosure would clearly and demonstrably be expected to . . . reveal the name or identity of a *living* individual who provided confidential information to the United States" and "pose a substantial risk of harm to that individual." § 4(B)(2), 132 Stat. at 5493-94 (emphasis added). The FBI does not dispute that both Mr. Bryant and the source of the Bryant Audio are deceased, *see* ECF No. 21-1, at 25 (Mr. Duda stating that "the source of the [Bryant Audio] is deceased"); ECF No. 29-1 ¶ 10 (admitting that "the persons that Plaintiff alleges are known to be deceased are, indeed, deceased"); accordingly, the RCA provides no basis to postpone disclosure of the Bryant Audio. Indeed, the RCA requires NARA to engage in periodic review of postponed records to decide whether to continue the postponement—effectively guaranteeing posthumous publication. § 5(h), 132 Stat. at 5496.

What is more, the RCA specifically contemplates reducing the scope of most FOIA exemptions. The RCA contains a provision directing that "when this Act requires transmission of a record to [NARA] or public disclosure, it *shall take precedence over any other law* . . . , judicial decisions construing such law, or common law doctrine that would otherwise prohibit such transmission or disclosure." § 9(a)(1), 132 Stat. at 5502. In so doing, the RCA singles out one FOIA exemption that continues to apply—that is, where the FOIA exemption would prevent disclosure notwithstanding the RCA, providing that the "Act shall not require the public disclosure

---

[13] *Available at* https://perma.cc/6LAF-A79Y.

of information that is exempt from disclosure under [FOIA Exemption 6, which applies to personnel and medical files]." § (9)(a)(2), 132 Stat. at 5502; *see* 5 U.S.C. § 552(b)(6). This demonstrates that Congress contemplated the interaction between the RCA's disclosure requirements and FOIA's exemptions, and it determined that the RCA trumps FOIA Exemption 7(D). *See TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980)). The RCA also reaffirms individuals' right to seek records under FOIA, § 9(b), 132 Stat. at 5502, again suggesting that Congress crafted the RCA to maximize disclosure save a few enumerated exceptions.

Defendants offer no real substantive response to Mr. Duda's argument about the RCA. In their partial summary judgment briefing, they made a fleeting statement that the RCA "is a separate statute not at issue here" and that "[t]he issues here are determined pursuant to the FOIA, not some other statute." ECF No. 29, at 11-12. But this is wholly unresponsive to the relevant question: whether Defendants "reasonably foresee[] that disclosure would harm" the FBI's interest in protecting its confidential sources. 5 U.S.C. § 552(a)(8)(A)(i)(I). Because the RCA abrogates confidentiality for witnesses in civil rights cold cases, the FBI *cannot* make the type of unreserved assurances of confidentiality that it may be able to make in other contexts. As a result, Defendants cannot show that disclosure here would weaken the strength of the FBI's promises. The D.C. Circuit has previously recognized that where the "FBI is obligated by law to provide information" to another part of the government, the agency cannot cite general chilling effects as a foreseeable harm of disclosure. *Reps. Comm. for Freedom of the Press*, 3 F.4th at 370-71. As

Mr. Duda aptly put it: "the harm (if any) the FBI fears has already occurred by force of law—and would not accrue as a result of the disclosure of the records at issue here." ECF No. 32, at 15.

While FOIA Exemption 7(D) provides no room for judicial balancing in the threshold decision whether the exemption applies, the foreseeable-harm requirement "impose[s] an independent and meaningful burden on agencies." *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369 (alteration in original) (quoting *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019)). Defendants bear the burden of demonstrating foreseeable harm, but their generalized contention that any disclosure "would display an unwillingness by FBI to honor its assurance of confidentiality," ECF No, 17, at 13, cannot be squared with Congress's specific abrogation of confidentiality for deceased witnesses in civil rights cold cases.

## V. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendants' Motion to Strike, ECF No. 44, is **GRANTED**, and Plaintiff's Supplement, ECF No. 43 is **STRICKEN** from the record. It is further **ORDERED** that Defendant's Renewed, *Ex Parte* Partial Motion for Summary Judgment is **DENIED**. And it is further **ORDERED** that (1) Defendants shall file, under seal, a proposed redacted version of the order for the public docket on or before October 9, 2026; and

(2) the parties shall meet and confer and file a joint status report on or before October 26, 2026, proposing next steps concerning the Bryant Audio.

**SO ORDERED.**

LOREN L. ALIKHAN
United States District Judge

Date: September 25, 2026